**SOUTHWESTERN BELL TELEPHONE COMPANY, Own Risk, Petitioner,**

v.

**Thyra Miller NELSON, Administratrix, and State Industrial Court, Respondents.**

No. 39272.

Supreme Court of Oklahoma.

July 16, 1963.

Rehearing Denied Sept. 10, 1963.

Donald H. Sharp, James A. DeBois, B. E. Harkey, Don Anderson, Oklahoma City, for petitioner.

Stubbs & Douglas, Charles W. Stubbs, James E. Douglas, Oklahoma City, Mac Q. Williamson, Atty. Gen., for respondents.

JACKSON, Justice.

Clifford E. Nelson, age 54, and an employee of Southwestern Bell Telephone Company, suffered a heart attack during

the afternoon of December 10, 1958, and was dead upon arrival at the hospital at 2:45 P. M. His widow, Thyra Miller Nelson, hereinafter called claimant, filed a claim and was awarded death benefits against the telephone company by the Industrial Court. This proceeding is brought by the telephone company for review.

Telephone company contends that there is no competent evidence reasonably tending to support the finding of the Industrial Court that Mr. Nelson died as the result of an accidental injury arising out of and in the course of his employment. The argument is that the evidence does not show that the heart attack was provoked by Mr. Nelson's labor and that claimant has not established such fact by competent and admissible testimony.

The record shows that for a number of years Mr. Nelson was a customer-trouble repairman. His normal duties were repairing telephones. However, because of a leg injury resulting from a fall from a telephone pole in 1955 Mr. Nelson was not expected to climb telephone poles.

During the afternoon of December 2, 1958 (being eight days before his fatal heart attack) Mr. Nelson was directed by company to repair a telephone for Murray Womble Company on North Santa Fe street in Oklahoma City. A telephone repairman testified that in making these repairs Mr. Nelson necessarily climbed a pole or two in order to reach the line which was eighteen feet from the ground. He finished these repairs at about 4:00 o'clock P. M.

In order to show that Mr. Nelson suffered a heart attack as a result of climbing the pole on December 2, 1958, Mrs. Nelson was called as a witness in her own behalf and testified that Mr. Nelson returned home during the latter part of the afternoon of that day. Over the objections of company she was permitted to testify as follows:

"A. * * * I saw him get out of the truck; and he had, his shirts— he had a light shirt and a heavy shirt besides his jacket—and he had both of them open; and he came over to me and he had—he said, 'I just had the darndest time that ever was.' I said 'What in the world is the matter with you?' The perspiration was just pouring off his shirt. He was ash colored. I said, 'What in the world has happened to you?' He said, 'I had a terrific pain in my chest and both my arms began to be almost paralyzed'. I said, 'Maybe you'd better come in and let me do something for you.' And I said, 'Let's call the doctor.' he said, 'I'll be all right. I think it's indigestion.' And I said, 'Where were you?' He said, 'I was over here by Santa Fe.' And I said—he came on in and he sat down for a minute and I fixed him an Alka Seltzer, and I gave it to him, and he pulled his handkerchief out of his pocket and it was just soaking wet. He said, 'If you think I didn't perspire, you're just crazy, because there it is.' He was staring around. I said, 'Cliff, you'd better let me call a doctor.' He said, 'I'll be all right in just a minute.' And he said, 'The pain has gone down.' And I said, 'You'd better let me call somebody to come and pick up your truck.' And he said, 'No, I'll be all right', said, 'I'll make out my reports and take the truck in.'

"Q. What did he do then?

"A. He laid down for a while, and he, just when he was lying there on the divan, just looked like he was dead, just had such a color.

    *    *    *    *    *    *

"A. It was a sort of an ashy color, you know, just—he was a kind of dark complected fellow, just looked gray, and his mouth was just blue. I was really alarmed about him.

    *    *    *    *    *    *

"A. He stayed 20 or 30 minutes.

"Q. Did he get up and leave then?

"A. Yes, sir, he got up and left, with me begging him to let me call somebody and get him to a doctor, to take him to a doctor.

\*   \*   \*   \*   \*   .\*

"A. He took his truck and went back to work."

Mr. Nelson continued working for the telephone company after December 2, 1958, and was at work for the company during the day on December 10, 1958, when he suffered his fatal heart attack at about 2:00 o'clock P. M.

In order to show that the fatal heart attack was labor connected, or labor provoked, claimant was permitted to testify, over objections of the company, that late in the morning of December 10, 1958, her husband had climbed a stairway to repair a telephone for an engineering company. After testifying that her husband returned home for lunch on December 10, 1958, she further testified:

"A. He (Nelson) came in the back door and he came into the kitchen and sat down in the chair, and he drew a deep breath, just about like that—(indicating).

"Q. Just a deep sighing breath?

"A. Yes. And—do you want me to go ahead? And I asked him, 'What's the matter with you?'

"Q. Go right ahead. What did he say?

"A. He said 'Oh, I'm tired.'

"Q. What did he say to you after he sighed?

"A. He said, 'I'm just tired.'

"Q. Did he say anything else to you?.

"A. I said, 'Well, what have you been doing?' And he said, 'I have been on several—I just did a routine job.' And I said, 'Why are you tired doing a routine job?' And he said, 'Well, I promised an old boy over here at the engineering company I would fix his phone; and I went by—I knew you was listening to your soap opera, and it would be a few minutes before you would have lunch, and I thought I'll stop on the way and do that routine job, and I did, and I climbed that stairs'; and said, 'I guess I'm getting old.' "

Company moved to strike this testimony upon the ground that the widow could not testify to what her deceased husband had told her concerning the accident under the provisions of 12 O.S.1961 § 385. The trial court admitted the testimony under the belief that the conversation between husband and wife was sufficiently close to the time of the "accident" to be a part of the res gestae. In this connection, and according to Mrs. Nelson's testimony, the conversation would have been fifteen or twenty minutes after Nelson had climbed the stairs.

A secretary at Benham Engineering Company, located on N. E. 23rd Street in Oklahoma City, and within a few blocks of Nelson's home, was asked by claimant's counsel if she could recall a telephone repairman coming to their office "on or about December 10, 1958." Her answer was in the affirmative, however, she could not identify the man and could not describe him except to say that he was tall. She noticed nothing unusual about him and could not say what effect climbing the stairs had on him. Company records indicate that a telephone man, a Mr. Van Wyngarden, appeared at Benham's on November 18, 1958, and not on December 10, 1958. Company records do not reflect the doing of any telephone repair work at Benham's after November 18, 1958, but there was testimony that on some occasions if a repairman received a call direct from a customer there would be no record unless the repairman made a record of it, although it would be his duty to do so. Records kept by Mr. Nelson did not show that he made a service call at Benham's on December 10. 1958.

A hypothetical question was propounded to claimant's Dr. S wherein it was assumed

that Mr. Nelson climbed two telephone poles at Womble Construction Company during the afternoon of December 2. 1958; that he worked in an attic in connection therewith; that he showed complaints of chest pains, white-like appearance, heavy perspiration, generally tired and very short of breath, and complained of pain in his chest around his abdominal area, and was asked if he found any causal connection between the climbing of the poles and his illness. Dr. S was of the opinion that it was not a causative factor but was a precipitating factor; that it probably did not cause the coronary trouble but that it was a factor which increased the severity of the trouble he already had; that it brought about the pain (described by Mrs. Nelson).

A further hypothetical question was propounded to Dr. S wherein it was assumed that eight days later (December 10, 1958) Mr. Nelson performed three jobs as a repairman until about 12:00 noon, and then climbed the stairway at Benham's and made telephone repairs for them requiring about ten or fifteen minutes and then drove home, approximately thirteen blocks, and complained to his wife of being very tired. Based upon these assumed facts, and other facts not controverted, Dr. S testified that he was of the opinion that the climbing of the stairs at the engineering company "was a precipitating factor causing his (Nelson's) death." Asked if there was a causal connection between the stairways and his death and the climbing of the telephone poles on December 2, 1958, the doctor stated:

"A. No, I don't really think so. I think he had his coronary artery disease, and any excessive exercise with coronary artery disease will precipitate pain, but to produce death you have to have sufficient occlusion to decrease the blood supply to the heart to the point where it cannot function.

"Q. And the climbing the stairway on December 10th, in your opinion, was the precipitating factor causing the coronary occlusion?

"A. That's right."

The doctor's testimony was objected to by company upon the ground that the question assumed facts not in evidence.

Since claimant's doctor assumed that Mr. Nelson climbed the stairs as testified to by claimant, and there is no other satisfactory evidence that he climbed the stairs, it follows that the hypothetical question which assumed that he did climb the stairs, and the doctor's conclusions based thereon, are improper unless claimant's testimony in reference to the stairs was properly admitted.

Telephone company contends that claimant's testimony was improperly admitted in that it was objectionable (1) as hearsay; (2) objectionable under 12 O.S.1961 § 385; and (3) not admissible as res gestae.

■ From decisions which we have considered it is apparent that res gestae constitutes an exception to the hearsay rule. We are also of the view that the res gestae rule constitutes an exception to that portion of Section 385, supra, wherein it is provided that a spouse shall not be permitted to testify concerning any communication made by one to the other during the marriage, whether called as a witness during or after the marriage. If we can have a clear picture of the res gestae rule, and how it was used and applied at or about the time of the enactment of Section 385, supra, then it will be much easier for us to resolve the conflict between res gestae and Section 385, and to more accurately draw a line between the two at a location which must have been contemplated by the Legislature. When this line is drawn we think it will also define the boundary between res gestae and hearsay.

■ We expressed the characteristics of res gestae in the second and third paragraphs of the syllabus in Smith v. Chicago, R. I. & P. Ry. Co. (1914), 42 Okl. 577, 142 P. 398, as follows:

"2. The rule is that declarations, to become a part of the res gestae, must accompany the act which they are supposed to characterize and explain, and must so harmonize as to be clearly one transac-

tion. To make such declarations competent as evidence, they must exclude the idea of a narration of past occurrences of events, and they must have been made contemporaneous with the transaction or act which they are supposed to characterize and explain."

"3. Declarations of a party injured, made subsequent to receiving the injuries, if wanting in spontaneity and instinctiveness, are but the party talking about the facts, and not the facts speaking through the party, and form no part of the res gestae, but are self-serving declarations, and as such are properly rejected as evidence."

In Wray v. Garrett (1939), 185 Okl. 138, 90 P.2d 1050, we said that where the statement was merely a narrative of past happenings, deliberate rather than spontaneous, and made under circumstances where the mind was not controlled by shock or excitement, it was not admissible as res gestae.

In Kansas, O. & G. Ry. Co. v. Dillon, Adm'x (1942), 191 Okl. 671, 135 P.2d 498, we held that statements made only a few minutes after the accident, and under such circumstances as to preclude the possibility of design, should be admitted as res gestae.

In Sand Springs Railway Co. v. Piggee (1945), 196 Okl. 136, 163 P.2d 545, we held that a statement provoked by an accident and made when tension and excitement due to the accident was still high, was res gestae.

The identifying characteristics of res gestae, "spontaneous" and "instinctive", have been applied and utilized as to involuntary expressions of pain as an exception to the hearsay rule.

In DeWitt v. Johnson (1935), 170 Okl. 625, 41 P.2d 476, it was contended that expressions of pain by a child, made long after the accident, would constitute hearsay. In disposing of the question we said:

"The general rule is well stated in Note 65 A.L.R. 577: 'It is a well settled general rule that, where the bodily or mental feelings of a person are to be proved, the usual and natural expressions and exclamations of such person which are the spontaneous manifestations of pain, and naturally flow from the pain being suffered by him at the time, are competent and original evidence, which may be testified to by any party in whose presence they are uttered.'

* * * * * *

"Wigmore on Evidence (2nd Ed.) vol. III, pp. 684, 687, has the following to say concerning the admissibility of pain statements:

" 'The general requirement (as the preceding quotations indicate) is merely that the statements shall be the spontaneous and natural expressions of the pain or suffering. * * *'

"Under the authorities cited in Wigmore and 64 A.L.R. 577, supra, as well as the cases referred to in volume 22 of Corpus Juris, at page 267, the general rule seems to be that evidence of complaints of pain and suffering if spontaneous and natural are admissible whether made to a physician or any one else. We prefer to follow the general rule * * *."

Since it is argued that under 12 O.S. 1961 § 385, supra, Mrs. Nelson was (1) an incompetent witness, and that (2) it was improper to admit communications between Mr. and Mrs. Nelson in testimony after the death of Mr. Nelson, we will consider these arguments together. We quote Sec. 385 (3) and divide it into parts (a) and (b) for convenience:

"(a) The following persons shall be *incompetent* to testify: * * *

"3. Husband or wife, for or against each other, except concerning transactions in which one acted as the agent of the other, or in any action growing out of personal injuries to either spouse, or when they are joint parties and have a joint interest in the action; (b) but

in no case shall either be permitted to testify concerning any *communication* made by one to the other during the marriage, whether called while that relation subsisted, or afterwards." (emphasis supplied)

The questions posed, (1) and (2), supra, are answered in reverse order in the second paragraph of the syllabus in Adkins v. Wright (1913), 37 Okl. 771, 131 P. 686, as follows:

"The statutes of this state (section 5842, Comp.Laws 1909 [12 O.S.1961, Sec. 385]), as well as the common law, prevent one spouse from giving testimony, falling under the head of privileged communications, against the other either during or after the marital relation has ceased; but neither the statute nor the common law prevents one spouse, after the marriage relation has been terminated, from testifying against the other, regarding independent facts within the knowledge of the witness, and not coming within the privilege."

The statutory distinction between "parts (a) and (b)", supra, have been observed and applied in the following cases: St. Louis & S. F. Ry. Co. v. Goode, Adm'x, 42 Okl. 784, 142 P. 1185, L.R.A.1915E, 1141; Hafer v. Lemon, 182 Okl. 578, 79 P.2d 216; and in Filtsch v. Curtis, 205 Okl. 67, 234 P. 2d 377. See also 97 C.J.S. Witnesses §§ 79, 82, and annotations on the subject of admissibility of communications between husband and wife in 63 A.L.R. 107 and 4 A.L.R.2d 835. The reasons for the incompetency of a spouse as a witness are considered in Sands v. David Bradley & Co., 36 Okl. 649, 129 P. 732, 45 L.R.A.,N.S., 396.

From our decision in Adkins v. Wright, supra, and the other cases which we have cited in connection therewith, it is clear that Mrs. Nelson was not an incompetent witness to testify to "independent facts" within her knowledge so long as she does not disclose communications which were made by one to the other during the marriage.

Section 385 "part (b)", supra, expresses the common law on the subject of communications between husband and wife. Res gestae is also a common law rule and it can not be assumed that res gestae was intended to annihilate the common law and statutory rule that communications between husband and wife would not be revealed in court. These two rules must be applied so that one will not destroy the other. If we expand the res gestae rule beyond its common law concept as it existed at the time of the enactment of Sec. 385, supra, we must be conscious of the fact that when we do we will to that extent infringe upon the legislative and common law purposes sought to be accomplished by Section 385. Res gestae was well defined at the time Section 385 was enacted and we must assume that the Legislature intended it as an exception to Sec. 385 "part (b)", or that res gestae expressions were not "communications" between husband and wife. Since a communication is ordinarily considered to be a deliberate interchange of thoughts or opinions, and res gestae expressions are not usually uttered to accomplish that purpose, it may be that res gestae expressions and declarations were not considered communications in the true sense.

In applying the res gestae, hearsay, and communications rule, we now consider the testimony of Mrs. Nelson to determine what parts were admissible.

Her testimony relating to the events of December 2, 1958, that she saw her husband get out of the truck; that he was wearing two shirts and both were open; that perspiration was just pouring off his shirt; that he was ash colored; that he came in the house and "I fixed him an Alka Seltzer"; that he pulled his handkerchief out of his pocket and it was soaking wet; that he was staring around; that he lay down for a while and looked like he was dead and had such a color; that he looked gray and his mouth was blue; and that he stayed about twenty or thirty minutes and went back to work, are clearly not hearsay but are observable facts and acts. Any

usual and natural spontaneous expressions of pain made in Mrs. Nelson's presence during the afternoon of December 2, 1958, and reported in her testimony, would not be hearsay. His communication of past occurrences and events and how he *had* felt would appear to be hearsay and "communications" and not admissible unless it can be said that he was in shock. From our examination of this testimony, however, we believe there was enough admissible testimony to support the hypothetical question based thereon, and sufficient to support the doctor's conclusion that the activities of the afternoon increased the severity of Mr. Nelson's trouble.

In reference to Mr. Nelson's activities of December 10, 1958, Mrs. Nelson testified that Mr. Nelson "came into the kitchen and sat down in the chair" and drew a deep breath, just like that—(indicating) * * * just a deep sighing breath." This was not hearsay or a "communication". This testimony was a report of observable physical acts and observable audible and verbal acts, as distinguished from a verbal descriptive statement. The deep sighing breath was an observable spontaneous manifestation of a bodily condition and was not hearsay and it was not a communication in the sense contemplated by Sec. 385, supra. The question "What's the matter with you" and the answer, "Oh I'm just tired" were not admissible unless they fall into the category of spontaneous manifestations of a bodily condition. It does not appear that he was in shock.

The testimony that "I just did a routine job"; "Well, I promised an old boy over here at the engineering company I would fix his phone"; "and I thought, I'll stop on the way and do that routine job, and I did, and I climbed that stairs", were all communications between husband and wife relating to "past occurrences of events". They were not spontaneous and instinctive while under shock and were not admissible as res gestae, but were inadmissible as communications under Section 385, and also constituted hearsay.

Our attention is invited to Collins-Dietz-Morris Company v. Richardson, Okl., 307 P.2d 159; Terry Motor Company v. Mixon, Okl., 336 P.2d 351 and 350 P.2d 953; Rigdon & Bruen Oil Company v. Beerman, Okl., 346 P.2d 169; Glaspey v. Dickerson, Okl., 350 P.2d 939; and Kelley v. Enid Terminal Elevators, Okl., 372 P.2d 589.

The cited cases dealt with hearsay testimony; with Section 385, supra; and with res gestae. An examination of these cases does not disclose any manifest intention to depart from the rules as laid down in earlier decisions of this court. It does appear that the rules were applied rather loosely in one or more of the cited cases, but the law itself was not changed.

Having concluded that Mrs. Nelson's testimony to the effect that Mr. Nelson climbed the stairs was improperly admitted it follows that Dr. S's expert opinion as to causation was based on the improper assumption of a fact not in evidence and is therefore without probative force. Glaspey v. Dickerson, supra.

Award vacated.

HALLEY, V. C. J., and WELCH, DAVISON, JOHNSON, IRWIN and BERRY, JJ., concur.