**ARKANSAS LOUISIANA GAS COMPANY and United States Fidelity and Guaranty Company, Petitioners,**

v.

**Ida E. EVANS and the State Industrial Court of the State of Oklahoma, Respondents.**

No. 40937.

Supreme Court of Oklahoma.

Nov. 24, 1964.

Fenton, Fenton, Smith & McCaleb, Oklahoma City, for petitioners.

William A. Kerr, Charles R. Nesbitt, Atty. Gen., Oklahoma City, for respondents.

HALLEY, Vice Chief Justice.

On March 22, 1963, Ida E. Evans, claimant herein, filed a claim for death benefits under the Workmen's Compensation Law against Arkansas Louisiana Gas Company, petitioner, and its insurance carrier, United States Fidelity and Guaranty Company, alleging that on the 25th day of December, 1962, John Ed Evans, while in the employ of petitioner sustained an accidental injury consisting of an injury to his heart resulting in his death; that the heart attack was brought about by unusual exertion and strain; that she, as surviving widow, was deceased's sole and only dependent.

The evidence disclosed that deceased was employed by petitioner at its Minco compressor station as an operator. His duties were to check the natural gas fed engines, keep them clean, lubricate them, and do whatever was necessary to keep them operating properly. Each engine had a "lubricator" on it which contained a certain amount of oil. The lubricating oil was stored in a building north of the auxiliary building where the engines were; it was stored in fifty-four or fifty-five gallon barrels or what is commonly called "drums." As the oil was needed, a drum would be moved from its storage place to the auxiliary building where a pump would be put in the drum. The oil would then be pumped from the drum into smaller containers ranging from five quarts to five gallons and poured from these containers into the lubricators on the engines. Deceased's hours were from 4 P.M. to 12 P.M.

Claimant testified that on the day employee died he left for work at 4 o'clock, that about 10:45 P.M. he was brought home by two fellow employees; that when deceased came in the house he told her to call the doctor, and told her he was hurting in his chest and arms; that she called the doctor but before he arrived employee had expired. In response to questions from the trial judge claimant further testified that deceased was pale, that he said he was sick, that he appeared to be suffering from the expression on his face. At the time claimant was testifying, she was not questioned as to dependency. At a later date it was stipulated by the parties if claimant were recalled she would testify that the deceased was her sole and only means of support and that she was wholly dependent upon his support.

Virginia Evans Strickler testified by deposition for claimant. Witness testified that she was the daughter of deceased, married and forty years of age; that on the day deceased died she was spending the day with her parents; that she remembered when her father went to work, and that he appeared at that time to be feeling fine; that she next saw him that night between 10:30 and 11:00 o'clock, that he was lying on a couch in the den and "he was in severe pain." Witness was asked by claimant's attorney if at that time she talked to deceased and to relate the conversation, if any there had been. Witness testified,

"Well, I asked him what had happened and what was wrong, and he said well, he had a severe pain in his chest and in his arms and that it began about 8:00 o'clock. He said he had lifted a drum of oil, or something, and at this time he had this severe pain in his chest and that it went into his arms or in his left arm, then he said he began feeling ill and although he felt ill he said he kept on working and then around 9:00 or 10:00 o'clock he decided he couldn't work any longer and he was still feeling much, much pain."

It is the admission of the above conversation into evidence of which petitioners complain.

Mrs. Strickler further testified that at the time of the conversation deceased was very pale, looked unnatural, was complaining of pain and discomfort and immediately died.

Joe Goldsmith, a fellow employee, testified by deposition for claimant. He stated that he saw deceased for the first time on the fatal day at 4:00 o'clock P.M. when deceased reported for duty. He testified as to what deceased's duties would normally be, that is, check, clean, lubricate engines, "whatever needs to be done at the motors, the engines", that as far as he knew it was deceased's duty to bring in a new supply of oil from storage when needed; that he had seen deceased at different times bring the supply to the auxiliary room; that the drums are heavy; that while he did not see deceased lift a drum of oil on the day of deceased's death, he had on occasions seen him lift drums and at different times helped deceased lift them. Witness testified that it was a cold, windy day between 20 and 24 degrees, and that deceased went outside some in doing his duties. Witness testified that about 6:00 o'clock P.M. deceased ate his "lunch" there at the plant and at that time complained that he ate a little too much and had a little indigestion; that at about 8:00 o'clock P.M. deceased, after making his rounds wasn't feeling well, and around 9:00 o'clock P.M. deceased came into the office where witness was and said his arm and across his chest was hurting every time he got out in the wind and that deceased looked a "little peaked"; that he tried to get deceased to go home but that deceased refused, saying he was all right, that he could finish his tower; that deceased came back to the office a little before 10:00 o'clock P.M. and said he had to go "pour" his oil and that he was feeling quite a bit worse. Witness further testified that at that time he could tell deceased was in pain, that he looked worse, that he put his head on the desk and said he had never had a pain like that before, but that deceased went on out to "pour" his oil; that shortly thereafter he saw deceased sitting in the auxiliary building; that he looked paler and was hurting; that he and another employee took deceased home; that twice he had to stop the car for deceased to vomit; that after he got deceased home he never saw him alive again.

Dr. S testified for claimant by deposition. Claimant propounded the following hypothetical question to Dr. S:

"Doctor, assuming that a man, a white male, approximately sixty-three years of age, in reasonably good health, that on the afternoon of December 25th, 1962, that he left for work somewhere around the hour of 3:00 o'clock p. m., and that to those who saw him when he left home to go to work, stated that he appeared to be feeling fine and with no complaints, and that about 8:00 o'clock or thereabouts of that same evening, that is 8:00 o'clock p. m., that he lifted a barrel or a drum of oil, or fluid, and that he had pain in the center of his chest and running into his arms, and particularly into his left arm, that he became ill and that about 10:00 o'clock p. m., which was approximately two hours before his shift would have ended, that his fellow employees took him home, driving some few miles, taking some few minutes to get him from the plant to his home, and that upon arriving at home he ap-

peared to be ill; that he was pale and that his normal complexion was one of ruddiness, and that he immediately laid down on the divan and stated that he was hurting and sick, and that within fifteen or twenty minutes he died. First, doctor, based upon your training and experience, and within the realm of reasonable medical certainty, are you able to form a reasonable medical opinion as to what most likely and probably caused his death?"

Dr. S testified in answer:

"Yes, because of the typical history of severe chest pain radiating into the left arm, and pain and indigestion and changing color which lasted some two hours or more, I feel certain that the man developed coronary occlusion while exerting and lifting this drum in the time relationship of the pain, the onset of the pain to the exertion, the length of time the pain lasted, resulting in death soon thereafter, is characteristic of coronary thrombosis, and I feel certain that because of this, the coronary thrombosis was precipitated, undoubtedly, by the strenuous exertion and lifting this drum, and that this was the cause of his death."

The death certificate, signed by another doctor, was made a part of the record. It revealed that coronary thrombosis was the cause of employee's death.

This then is the evidence on behalf of claimant. The only evidence introduced by petitioner was the medical report of a doctor who after examining the depositions of Virginia Evans Strickler, Joe Goldsmith and Dr. S, and the transcript herein, stated that in his opinion the actual cause of employee's death was unknown and no causal connection between his employment and his death.

In asking this Court to review the case, petitioner advances one proposition:

"The evidence is insufficient to support the finding that the deceased, John Ed Evans, sustained an accidental personal injury on December 25, 1963, causing his death on that date."

■ In support of its contention petitioner urges that the Industrial Court erred in admitting the evidence of Virginia Evans Strickler relating to the conversation of the deceased to her at his home concerning his lifting the drum of oil; that the fact as to whether deceased lifted the drum is essential to Dr. S's opinion as to what caused the deceased's death; that the statements made by the deceased and testified to by Mrs. Strickler were hearsay and that her testimony did not fall within any of the exceptions to the hearsay rule; that Dr. S's expert opinion as to causation of death was therefore based on an improper assumption of fact not in evidence and therefore without probative force.

We do not agree.

■ As a general rule, testimony of a witness as to statements of an employee as to the cause or circumstances of his injury or disability are inadmissible as hearsay, however, such statements may be admissible in compensation proceedings. 100 C.J.S. Workmen's Compensation § 534, p. 531; Glaspey v. Dickerson, Okl., 350 P.2d 939. As a general rule, a self-serving statement made by an injured workman as to the cause of the injury is not, after his death, admissible, but it is not disputed that evidence of declarations may be admissible in compensation cases under the rule or doctrine of res gestae. 58 Am.Jur., Workmen's Compensation § 445, pp. 863, 864. It is a well-settled general rule that, where the bodily or mental feelings of a person are to be proved, the usual and natural expressions and exclamations of such person which are the spontaneous manifestations of pain and naturally flow from the pain being suffered by him at the time, are competent and original evidence, which may be testified to by any party in whose presence they are uttered. See 64 A.L.R. 557; Glaspey v. Dickerson, supra; Collins-Dietz Morris Co. v. Richardson, Okl., 307 P.2d 159.

■■ To be admissible as a part of the res gestae, a statement must be substantially contemporaneous with the transaction, spontaneous rather than deliberative, and induced by the happenings of the events concerning which the statement was made, and not a narrative statement of what occurred in response to questions, and while much has been written on the subject of res gestae, no definite rule can be stated, but rather, the admissibility of such statements must depend upon the particular circumstances of each case and in a great measure is left to the discretion of the trial court. Kelley v. Enid Terminal Elevators, Okl., 372 P.2d 589; Huffman v. Gaylor, Okl., 267 P.2d 564; Standard Accident Ins. Co. v. Baker, 145 Okl. 100, 291 P. 962; Wray v. Garrett, 185 Okl. 138, 90 P.2d 1050; Rigdon & Bruen Oil Co. v. Beerman, Okl., 346 P.2d 169.

Petitioners rely on the cases of Wray v. Garrett, 185 Okl. 138, 90 P.2d 1050, and Southwestern Bell Telephone Co. v. Nelson, Okl., 384 P.2d 914, as authorities to support their position.

The cases cited and the one before us are easily distinguishable.

In the Garrett case is found the following language:

"The facts in this connection are as follows: The accident occurred at 9:30 in the morning on a bridge. Charles I. Garrett was left on the floor of the bridge where he had been thrown for about forty-five minutes, during which time he conversed with bystanders, and in answer to questions, told his name and where he was from. Several times he asked to be moved to relieve the pain in his back. Thereafter, he was taken in an ambulance about ten miles to a hospital where he talked with his daughter and where he was given first aid treatment to relieve his pain. While he was in the hospital, about three hours after the accident, he was asked the cause of the accident, and in reply, made the statement objected to, that is, that 'the fellow would not give him

time to get across the bridge', and 'that guy saw me coming and wouldn't wait until I got off'.

"The evidence is that at the time he was making these statements he was either conscious or semi-conscious. It is not contended that he was totally unconscious and there is no evidence that his semi-consciousness was of such extent that he could not comprehend what had happened.

"We think it clear from the undisputed evidence that the statement was not made while Garrett was still under the dominating influence of shock and excitement, but rather it was simply a narration of past events, deliberately made in answer to a question propounded."

The judgment was reversed with directions to grant a new trial.

In the Nelson case the facts were that Nelson was a customer-trouble repairman for Southwestern Bell Telephone Company. His normal duties were to repair telephones. But because of a leg injury deceased was not expected to climb poles. On the afternoon of December 10, 1958, he suffered a heart attack and was dead on arrival at the hospital. During the afternoon of December 2, 1958, eight days before the fatal attack Nelson was directed to repair a telephone at a certain location. At the trial a fellow employee testified that in making the repairs Nelson necessarily climbed a pole or two. In order to show that Nelson suffered a heart attack as a result of climbing a pole on December 2, 1958, claimant was permitted to testify as to deceased's appearance and demeanor on his arrival at home and also as to certain statements he made to her at the time. The statements were "I just had the darndest time that ever was", "I had a terrific pain in my chest and both my arms began to be almost paralyzed", "I'll be all right. I think it's indigestion", "If you think I didn't perspire, you're just crazy, because there it is", "The pain has gone down." As to that testimony we

said what the witness observed about the deceased's appearance and demeanor was proper and clearly not hearsay, and that any usual and natural spontaneous expressions of pain made in the witness' presence would not be hearsay, but that deceased's communication of past occurrences and events and how he *had* felt would appear to be hearsay and "communications" and not admissible unless it can be said he was in shock.

In order to show that the fatal heart attack was labor connected on December 10, 1958, claimant was permitted to testify as to the following statements made to her by deceased on his return home at lunch time: "I just did a routine job", "Well, I promised an old boy over here at the engineering company I would fix his phone", "and I thought, I'll stop on the way and do that routine job, and I did, and I climbed that stairs." We held that the statements were all communications between husband and wife relating to "past occurrences and events", that they were not spontaneous and instinctive while under shock and were not admissible as res gestae. We found from the evidence that the deceased did not appear to be in shock at the time he made the statements above referred to.

In the instant case the evidence shows that at the time deceased made the statement objected to he was sick and suffering intense pain. The trial judge asked claimant in referring to deceased returning home just minutes before his death, "When he came in how did he appear to you?"

"A. Well, you could tell he was suffering.

"Q. The Court: Well how could you tell?

"A. By looking at the expression in his face.

"The Court: How was his color?

"A. Well, he was pale, real pale. Ordinarily he has kind of a red complexion."

\* \* \* \* \* \*

"A. We drove about forty feet north of the office and had to stop, and he got out and vomited, then we started again and got a little over a half mile east of the plant and had to stop and he had to vomit again.

"Q. How did he look on the way as you were driving him?

"A. He looked pretty bad, was feeling pretty bad till we got about three miles from the plant. He had the glass down, and when we got about three miles from the plant he rolled it up and said he was feeling better.

"Q. You proceeded on home with him?

"A. Yes \* \* \*."

"A. He was lying on the couch and he was in severe pain.

\* \* \* \* \* \*

"A. Well, he was very pale, \* \* \*."

"Q. Did he look unnatural then?

"A. Very much.

"Q. Was he complaining of pain and discomfort at the time?

"A. Yes."

On cross-examination, Virginia Evans Strickler was asked:

"Q. And you stated that he appeared to be sick?

"A. Yes."

Taking into consideration all the circumstances under which the statement was made we feel that it can safely be stated that it was spontaneously made, that it was provoked by pain and suffering and while the deceased was in shock.

When Mrs. Strickler went into the den and saw her father lying on the couch obviously ill, it was a normal expectant reaction from one concerned about a loved one to ask, "what happened?" and "what is wrong?". The statement made then and there by the deceased in response was not a narrative statement of past events, of past happenings, deliberative rather than spontaneous, but was a statement made

contemporaneously with the circumstances and in response to a normal, automatic question, spontaneous and instinctive rather· than deliberative, induced by the happenings of the events, and made when the mind was controlled by pain, shock and excitement and at the point of death. Immediately thereafter he died.

In the case of Parker v. Farmers Union Mut. Ins. Co., 146 Kan. 832, 73 P.2d 1032, the Supreme Court of Kansas said:

> " * * * we think the rule touching the admissibility of hearsay evidence in workmen's compensation cases to be: Where a workman dies of his injuries, the statements he had made to third persons touching the accident which caused his injuries may be received and accorded probative force, if such statements are inherently reasonable and not intentionally made for the purpose of being used as evidence to base a claim for compensation, and where the other evidence and attendant circumstances corroborate the statements so convincingly as to establish the fact of the workman's accident and injury with moral certainty."

█ Here, witness Goldsmith testified that it was a part of the deceased's duties to bring in a new supply of oil in drums from the storage building to the auxiliary building when needed; that he had seen ·deceased lift the drums in question, and on occasion he helped deceased with them and that on the night of deceased's death, de·ceased told witness that he had to make his rounds and "pour" oil. We feel this testimony is evidence that corroborates the statement by deceased that he lifted an oil ·drum.

█ We therefore hold that the testimony by witness Strickler relative to the conversation between her and deceased is admissible as part of the res gestae, and that the evidence is sufficient ·to support the finding that the death of claimant's husband was due to an accidental injury arising out of and in the course of his employment with petitioner.

Award sustained.

BLACKBIRD, C. J., and WILLIAMS and IRWIN, JJ., concur.

DAVISON and BERRY, JJ., concur specially.

JOHNSON and JACKSON, JJ., concur in result.

BERRY, Justice (concurring specially).

The term "spontaneous" as applied to "res gestae" expressions emphasizes the idea of an inner impulse acting without an external stimulus; it lays primary stress on the absence of external compulsion. A spontaneous expression is one made under the dominating influence of the very occurrence to which it relates. This is in contrast to communications which are elicited through a deliberate interchange of thoughts between two or more persons. Southwestern Bell Telephone Co. v. Nelson, Okl., 384 P.2d 914. Measured by these definitions, the statements by the deceased workman made in answer to his daughter's inquiry cannot, strictly speaking, qualify as spontaneous in nature. Although the daughter's initial question to her ·father was doubtless provoked instinctively by his sudden appearance in a state of ill health, this, of course, cannot in any way alter the fact that decedent's expressions were not voluntary or spontaneous but given in response to a direct query. The conversation between decedent and his daughter took place when decedent was resting at his home some three hours after the alleged episode of exertion.

While decedent's statements lack the requisite quality of spontaneity, there is, in my opinion, sufficient evidence here as to decedent's condition to justify our inference that at the time the expressions in question were made decedent was actually in a state of shock so that his reflective faculties remained stilled. This does, to

my way of thinking, eliminate the possibility of design and renders the statements admissible. Southwestern Bell Telephone Co. v. Nelson, supra.

I, therefore, concur specially in the Court's opinion.