BERGERON, Plaintiff in error, v. STATE, Defendant in error.

Supreme Court

*No. 76–534–CR. Argued October 2, 1978.—Decided October 31, 1978.*
(Also reported in 271 N.W.2d 386.)

For the plaintiff in error there were briefs by *Howard B. Eisenberg*, state public defender, and *Jack E. Schairer*,

assistant state public defender, and oral argument by *Mr. Schairer.*

For the defendant in error the cause was argued by *Pamela Magee-Heilprin,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

COFFEY, J.   There are 3 issues presented on appeal:

1.   Was it prejudicial error for the trial court to submit a jury question dealing with a single conspiracy rather than an alternative question as to the existence of a multiple conspiracy?

2.   Did the trial court err in permitting the admission of hearsay statements of co-conspirators which were allegedly not made during the course of and in furtherance of the conspiracy pursuant to sec. 908.01(4)(b)5?

3.   Did the trial court err in requiring the state to elect between the aider and abettor section and the conspiracy subsection of sec. 939.05, Stats.?

The defendant contends that the evidence adduced at trial raised a substantial issue of fact as to the existence of one or more conspiracies rather than one overall scheme to murder Marvin Boguskie. They maintained that the plan to kill Boguskie in the parking lot of the Gardner-Denver plant on December 29, 1975 constituted a separate and distinct conspiracy from the planned killing of Boguskie on December 30, 1975. Both the defendant and the co-defendant Neeley argue that they had withdrawn from the conspiracy after the December 29th planned killing failed to materialize and thus prior to Boguskie's murder. They allege Mark Moes was acting individually or in conjunction with others on the night of December 30th. The defendant alleges that the instructions and verdict as framed gave the jury a limited choice: (1) did the defendant participate in the con-

spiracy to kill Boguskie on December 30th? and (2) did the defendant Bergeron withdraw from the conspiracy prior to the December 30th slaying? The defendant claims that the single conspiracy verdict was prejudicial as the law of conspiracy permits the acts and declarations of co-conspirators to bind the other members of the criminal plan. *State v. Adams*, 257 Wis. 433, 43 N.W.2d 446 (1950) and *Schultz v. State*, 133 Wis. 215, 225, 113 N.W. 428 (1907). The defendant contends the facts in his case are analogous to the case law recited in *State v. Waste Management of Wisconsin*, 81 Wis.2d 555, 577–78, 261 N.W.2d 147 (1977) and *Kotteakos v. United States*, 328 U.S. 750, 767–771 (1946), wherein the respective courts held in the absence of a multiple conspiracy jury instruction there is the potential that a jury may use improper evidence regarding conspirators common to more than one conspiracy in determining the guilt of the individual defendant. We hold a single conspiracy existed to kill Marvin Boguskie through the date of December 30, 1975 and the defendant's position in regard to the existence of multiple conspiracies is without merit. The record does not indicate that the defendant requested a multiple conspiracy jury instruction. Even though the instruction conference was not transcribed, the record is void of any objection prior to or immediately after the reading of the instructions to the jury. The issue was first raised on motions after verdict where it was contended that the trial court *sua sponte* should have given a multiple conspiracy instruction. This court will not find error in the failure of a trial court to give a particular instruction in the absence of a timely and specific request before the jury convenes. Where the request has been denied, objection must be made in the record. *Laster v. State*, 60 Wis.2d 525, 539, 211 N.W.2d 13 (1973);[1]

[1] ". . . the record is void of any objection by the defendant to the instruction given. Absent a request made prior to the rendition

*State v. Schenk*, 53 Wis.2d 327, 333, 193 N.W.2d 26 (1972); *Kimmons v. State*, 51 Wis.2d 266, 268, 186 N.W.2d 308 (1971); *Mitchell v. State*, 47 Wis.2d 695, 700, 177 N.W.2d 833 (1970). The failure to request an instruction or to object effectively waives any right to review. *Langston v. State*, 61 Wis.2d 288, 293, 212 N.W.2d 113 (1973); *State v. Cydzik*, 60 Wis.2d 683, 694, 211 N.W.2d 421 (1973). However, in the case of plain error,[2] this court may use its discretionary powers of review to consider an issue which has been waived. *Werner v. State*, 66 Wis.2d 736, 751, 226 N.W.2d 402.

We hold that the failure of the court to *sua sponte* grant an instruction on the multiple conspiracy question did not constitute plain error. The failure to give the multiple conspiracy instruction is not "ipso facto"[3] prejudicial. *Berger v. United States*, 295 U.S. 78, 81 (1935) held that where an indictment charges a single conspiracy and multiple conspiracies are proven, the variance is not fatal when there is little possibility of jury confusion. *Kotteakos v. United States, supra* at 774, while finding a potential for the transference of guilt among members of separate conspiracies, thus differing in result from *Berger v. United States, supra*, noted that the result reached in *Berger* was correct under those factual circumstances. Therefore, the failure to instruct as to the existence of multiple conspiracies where multiple conspiracies are proven would constitute reversible error. We do not hold plain error in this case as the overwhelming evidence of guilt if the single conspiracy leaves

of the verdict, the objection has long since been waived." *Laster v. State, supra* at 539.

[2] As defined in *Virgil v. State*, 84 Wis.2d 166, 189–190, 267 N.W.2d 852 (1978).

[3] *Id.* at 190.

no possibility of jury confusion.[4] An instruction whether requested or not is to be given only where the evidence reasonably requires it. *State v. Amundson,* 69 Wis.2d 554, 564, 230 N.W.2d 775 (1975); *Fletcher v. State,* 68 Wis.2d 381, 385, 228 N.W.2d 708 (1975); *State v. Boutch,* 60 Wis.2d 397, 401, 210 N.W.2d 751 (1973). While the existence of multiple conspiracies is usually a question of fact for the jury,[5] this principle does not compel a court to give the multiple conspiracy instruction when as a matter of law the evidence does not require the instruction.

Substantively, the elements necessary to prove a conspiracy are:

"(1) An agreement among two or more persons to direct their conduct toward the realization of a criminal objective.
"(2) Each member of the conspiracy must individually consciously intend the realization of the particular criminal objective. Each must have an individual 'stake in the venture.' " *State v. Nutley,* 24 Wis.2d 527, 556, 129 N.W.2d 155 (1964).

Federal case law has delineated the characteristics of a single conspiracy from those of a multiple conspiracy as follows:

In a single conspiracy:
1. All parties knowingly join and participate in a single overriding scheme.
2. All parties intend to aid in the perpetration of this single illegal objective.

---

[4] *Id.* at 91. *Virgil v. State* recites that "Erroneously admitted evidence may tip the scales in favor of reversal in a close case, even though the same evidence would be harmless in the context of a case demonstrating overwhelming evidence of guilt." P. 91.

[5] *United States v. Crosby,* 294 F.2d 928, 945 (2nd Cir. 1961), *cert. den.* 368 U. S. 984, 82 S. Ct. 599, 7 L. Ed.2d 523 (1962); *United States v. Torres,* 519 F.2d 723 (2nd Cir. 1975); *United States v. Finkelstein,* 526 F.2d 517, 522 (2nd Cir. 1975).

3. All parties seek a common end through the comprehensive plan.

In a multiple conspiracy context:

1. No two agreements are tied together as stages in the formation of a larger, all-inclusive combination, each directed toward achieving a single unlawful end or result. Rather, each separate agreement has its own distinct, illegal end.

2. No conspirator, with the exception of a common figure, is interested in the aims of any other.

3. No conspirator aids in accomplishing the objectives of any other.[6]

In application to the present facts, the evidence does not indicate that there were separate conspiracies; one to be executed on December 29, 1975 and one to be performed on December 30, 1975. John Schroeder testified to meeting the defendant on a Friday evening (December 26, 1975) and on the next day being asked by the defendant if Schroeder knew of anyone in need of a job as the defendant would pay $1,000 to have someone "wasted." Schroeder said that he could not do it, but introduced the defendant to Mark Moes who agreed to do

---

[6] This formulation in substantial conformity to *Blumenthal v. United States*, 332 U.S. 539, 558–59 (1947).

*See also: United States v. Varelli*, 407 F.2d 735, 742 (7th Cir. 1969) where it was stated:

"The distinction must be made between separate conspiracies, where certain parties are common to all and one overall continuing conspiracy with various parties joining and terminating their relationship at different times. Various people knowingly joining together in furtherance of a common design or purpose constitute a single conspiracy. While the conspiracy may have a small group of core conspirators, other parties who knowingly participate with these core conspirators and others to achieve a common goal may be members of an overall conspiracy.

"In essence, the question is what is the nature of the agreement. If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, the agreement among all the parties constitutes a single conspiracy."

the killing. Schroeder stated the defendant said Schroeder would get $100 for finding Moes if Moes did the job. By the defendant's own testimony he stated that he met with Neeley before meeting Moes and that a plan to kill Boguskie was discussed. The defendant testified to telling Neeley that he could not do the murder but would find someone who would. The defendant told of meeting Moes and giving a description of the victim as well as a murder plan.

In aiding the perpetration of this single unlawful end, the murder of Boguskie, Neeley supplied the gun, the defendant and Schroeder hid the gun and Moes was to do the killing. Additionally, Neeley and the defendant taught Moes how to use the gun.

The initial plan in the conspiracy was that Moes was to kill Marvin Boguskie, the victim, as he left the Gardner-Denver plant on December 29, 1975 and Moes was to take the gun to the Boguskie home where it would be pulled up into the house on a rope, cleaned and placed with the other guns Boguskie owned. The "concealment" of the gun was the role of Russell Tom Boguskie. The defendant was to be waiting for Moes in a cab to return the parties to the Y.M.C.A. where Schroeder and the defendant resided.

The plan to kill Boguskie on the 29th was not accomplished as Boguskie exited from the plant while the parking lot was crowded with employees. The single fact of the slaying on December 30th does not prove a separate conspiracy nor a withdrawal by Bergeron. The aborted attempt on December 29th and the realization of the criminal objective on the 30th were fulfilled in the original design of the conspiracy, the slaying of Boguskie. It is not unusual for a conspiracy to require successive steps before its unlawful objective is accomplished. *Blumenthal v. United States, supra* at 556. Another

piece of the conspiratorial puzzle and scheme was the inspection of the murder weapon found in the Boguskie home. The detailed planning of the killing of Boguskie accomplished on the 30th of December which called for the sneaking of the gun into the second floor of the house by rope, cleaning and placing back in the gun rack was thus carried out pursuant to the initial plan. Thus, it is persuasive to find that the two plans were merely successive stages in a comprehensive plan or conduct of the conspirators on the night of the murder.

The defendant's claim of withdrawal from the conspiracy is inextricably bound to whether a second conspiracy was formed to accomplish the murder on December 30, 1975. The defendant offers a withdrawal defense based upon his own testimony and the testimony of co-defendant Neeley. The defendant testified to a meeting in the afternoon of December 30th with Neeley, Moes and Russell Tom Boguskie. Both the defendant and Neeley claim that at this meeting all murder plans were called off. Neeley testified to two telephone conversations with Moes wherein Moes agreed to get the gun and return it to the Boguskie home. The defendant also offered as evidence of his intent to withdraw and no longer aid in the perpetration of the crime that on the evening of the 30th he was in a bar entertaining a date. The court and the jury were free to disbelieve the foregoing assertions as self-serving. *Zelenka v. State*, 83 Wis. 601, 620, 266 N.W.2d 279 (1978) ; *Ring v. State*, 192 Wis. 391, 394, 212 N.W. 662 (1927). In order to prove withdrawal it is well settled that the burden of establishing withdrawal lies on the defendant and in order for such a defense to prevail a defendant must construe some type of affirmative action which disavows or defeats the purpose of the conspiracy wherein by "making a clean breast to the authorities or communication of the abandon-

ment in a manner reasonably calculated to reach co-conspirators." *United States v. Borelli,* 336 F.2d 376, 388 (2d cir. 1964), *cert. den.* 379 U.S. 960, 85 S. Ct. 647, 13 L. Ed.2d 555 (1965). The court finds that the defendant Bergeron did not effect a genuine or complete withdrawal from the murder conspiratorial scheme as the facts are related in the court record.

The existence of an alibi removing the defendant from the scene of the crime is not persuasive to the court in proving withdrawal from the murder scheme. The court finds it extremely doubtful that in the furtherance of a conspiracy that the plan would include the arrival of all members of the conspiracy at the time the unlawful objective is to be executed.

The defendant's insistence that he was not involved in the December 30th slaying is refuted by other evidence. Schroeder testified that upon the defendant's return from the December 30th afternoon meeting, Schroeder asked Bergeron if the plan was still in progress, to which the defendant allegedly answered "yes." As to the defendant's contention only as to the limited question of his withdrawal from the conspiracy it is noteworthy to point out that Schroeder also testified that on the day following the murder the defendant told Schroeder to check his mailbox where the co-defendant Neeley was to have left the Thousand Dollar payment. Also, there is the defendant's post-arrest statement where he queried Moes on the day following the murder "Did you do it?" At trial the defendant explained that this question was in reference to whether Moes returned the gun to the Boguskie home pursuant to the directions given concerning its return in the afternoon meeting where it is alleged the murder plan was cancelled. The jury was free to believe or disbelieve the defendant's explanation in light of the defendant's interest in the outcome of this case.

While the above evidence may be circumstantial, there is a settled principle that in proving a conspiracy circumstantial evidence of a quantum is sufficient as it is well known evidence that the elements of secrecy and concealment are crucial to any conspiracy.[7] Despite the circumstantial nature of the evidence, it exhibits that the defendant's acts and declarations were inconsistent with the defense of withdrawal.[8]

The failure of the defendant to establish his withdrawal from the plan to murder Boguskie confirms the finding that a separate conspiracy did not exist and that the plan for the December 30th slaying was merely another stage in an overall scheme in his slaying; these successive stages of the overall plan being bound together with the four common actors [Bergeron, Schroeder, Neeley and Moes] and with common means for the accomplishment of a single objective.

The defendant alleges instances of prejudicial error by permitting the reception into evidence the inadmissible

---

[7] "Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved, the more successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others. Otherwise the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity." *Blumenthal v. United States, supra* at 557.

[8] It is well understood that circumstantial evidence is the proof of certain facts from which a jury may logically infer the existence of other facts according to the knowledge or common experience of mankind. Quoting from Jury Instructions, it is true that circumstantial evidence might be so weak so as not to meet the standard of proof required. However, circumstantial evidence may be, and often is, stronger and more convincing than direct evidence. Wis. J.I.—Criminal, Part I, 170.

hearsay statements of co-conspirators. The admission of the following testimony is claimed to be prejudicial by the defendant:

1. John Schroeder's statements as to contacting Mark Moes and informing him that the defendant would pay $1,000 for a killing.

2. The post-arrest statement of the co-defendant, Terry Neeley.

The evidentiary rule as to the admissibility of statements by co-conspirators which can be considered in binding other parties to the conspiracy is stated in sec. 908.01 (4) (b) 5), Stats.

"908.01.   Definitions
"The following definitions apply under this chapter:
" . . .
"(4)  STATEMENTS WHICH ARE NOT HEARSAY. A statement is not hearsay if
" . . .
"(b)  *Admission by party opponent*. . . . 5) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."

Under sec. 908.01(4)(b)5, statements of co-conspirators made during the course and in furtherance of the conspiracy are technically not exceptions to the hearsay rule, but are deemed not to be hearsay and therefore outside the exclusionary principles of the hearsay rule.

The defendant claims that sec. 908.01(4)(b)5 is inapplicable to the particular testimony because it was not made in the course and furtherance of the conspiracy. It is the defendant's contention that no conspiracy existed until there was a meeting of the minds between Moes and Neeley that Moes would do the killing. Therefore, Schroeder gave testimony regarding events prior to the

formation of the conspiracy, the defendant alleging that this background information concerning the defendant meeting with Mark Moes was prejudicial. The defendant also claims that the admission of Neeley's extra-judicial statement is inadmissible as the alleged conspiracy terminated with the murder of Boguskie.[9]

The issue of the admission of inadmissible hearsay is dependent upon a factual question as to when the conspiracy began and terminated. The trial court must rule on the admissibility of such statements or acts. This ruling has the weight of any other finding of fact, and will be dealt with as such on appeal. *Schultz v. State,* 125 Wis. 452, 104 N.W. 90 (1905). Just as the termination of a conspiracy cannot be determined by a hard and fast rule, neither can the commencement. Commencement and termination must be determined by the particular facts in each case. *State v. Adams,* 257 Wis. 433, 43 N.W.2d 446 (1950). A conspiracy commences with an agreement between 2 or more persons to direct their conduct toward the realization of a criminal objective and each member of the conspiracy must individually and consciously intend the realization of the particular criminal venture. Additionally, each conspirator must have an individual stake in the conspiracy. *State v. Nutley, supra* at 556.

---

[9] The federal rule is that a conspiracy terminates with the accomplishment or failure of the unlawful objective, and an out-of-court statement made during the concealment phase of the conspiracy is inadmissable. *Dutton v. Evans,* 400 U.S. 74, 81 (1970), citing *Lutwak v. United States,* 344 U.S. 604 (1953); *Krulewitch v. United States,* 336 U.S. 440 (1949). Wisconsin has not adopted the federal rule. It has been stated that a conspiracy continues during the course of the concealment, *Gelosi v. State,* 215 Wis. 649, 655–56, 255 N.W. 893 (1934) where in a conspiracy to commit murder the conspiracy continued until the body was disposed of. In the defendant's case there is nothing to indicate concealment was part of the conspiracy plan.

John Schroeder testified to his involvement in a plan to kill Marvin Boguskie in December of 1975 and to meeting the defendant on December 26th. Schroeder also stated that the defendant stayed in his room at the Y.M.C.A. that night. The next afternoon Schroeder and the defendant went to a bar where the defendant asked the witness if he knew of anyone needing a job. Schroeder replied that he did and asked what it was. The defendant replied that he needed someone "wasted" and the "job was worth $1,000." Schroeder indicated that "wasted" is slang for a murder or killing. Schroeder refused the offer but said he could put the defendant in contact with someone who would do it. An offer of proof was then submitted wherein Schroeder told of telephoning Mark Moes and describing the terms of the Thousand Dollar offer. Moes agreed to come to the bar to discuss the proposition with the defendant. Following the offer of proof, and over defense objection, Schroeder's testimony was repeated to the jury.

We find that an adequate foundation had been laid to permit the trial court to make a preliminary determination as to the admissibility of the statements that at the time the defendant asked Schroeder to perform the fatal act a conspiracy to commit murder existed between the defendant and the co-defendant Neeley. As previously noted, the defendant by his own testimony explained that he met with Neeley before approaching Schroeder or Moes and discussed the murder plan. At this meeting Neeley detailed the plan to kill Boguskie as he left the Gardner-Denver plant. The defendant Bergeron allegedly told Neeley he could not do the killing for $1,000 but would get someone who would. The defendant also testified to meeting with Moes and telling him that the victim was Marvin Boguskie and that Moes would be paid $1,000.

Although this court finds no weakness in the foundation testimony given by Schroeder that a conspiracy had commenced, any such insufficiency was cured by the defendant's own admissions. The elements of a conspiracy—a criminal objective; a conscious intent for the realization of the objective and an individual stake in the venture—were clearly satisfied by the totality of the evidence and circumstances. Conspiracies usually develop in successive stages when essential parties are recruited to fulfill the illegal scheme. The meeting of Moes and Neeley was not essential to the formation of the conspiracy, but was merely a part in the plan previously agreed upon by Neeley and the defendant.

The defendant further argues that Schroeder's testimony regarding the phone conversation with Moes constitutes inadmissible double hearsay and that prejudice is compounded by Moes' absence at trial thus denying the defendant his right to confrontation. *Bruton v. United States*, 391 U.S. 123 (1968); *Dutton v. Evans, supra.* The defendant's argument that Schroeder's recounting of the telephone conversation with Moes constitutes inadmissible hearsay fails in light of our finding that there was reasonable evidence to support the finding of a conspiracy existing prior to the conversation. Sec. 908.05, Stats.,[10] recites that double hearsay is admissible if each part of the combined statement conforms with an exception to the hearsay rule. Moes' role in the conspiracy is unquestioned and once having found a conspiracy to exist, sec. 908.05 permits a second co-conspirator to testify to statements of the absent co-conspirator made in the course and furtherance of the conspiracy. Thus, as to the

---

[10] "Hearsay within hearsay. Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in this chapter."

statements of Moes to Schroeder we do not find the same to constitute inadmissible double hearsay.

The challenge to the denial of confrontation is another question. This court recognizes the issue of admissibility under the hearsay rule is a separate question from whether there has been a denial of confrontation. *Virgil v. State, supra* at 185; *State v. Lenarchick,* 74 Wis.2d 425, 247 N.W.2d 80 (1976) ; *Dutton v. Evans, supra; California v. Green,* 399 U.S. 149 (1970).[11] The recitation by Schroeder of the telephone conversation with Moes was far less damaging to the defendant's case than was his own testimony which detailed the terms of the arrangement with Moes.

The defense argues that Moes' presence was crucial to delineate what the agreement was and whether the killing was only to be done at the victim's place of work on December 29th. We do not find a material link between this evidence and the alleged prejudice. In light of the defendant's statements against interest at trial, we believe Moes' presence was a matter of concern for the defense and not the prosecution.

In turning our attention to the question of whether the admission of Neeley's post-arrest statement was objec-

---

[11] "While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception. *See Barber v. Page,* 390 U.S. 719 (1968); *Pointer v. Texas,* 390 U.S. 400 (1965)." *Id.* at pp. 155–56.

tionable, we determine that there is no factual dispute that the conspiracy terminated with Boguskie's murder. Therefore, the statement would be inadmissible, falling outside the scope of sec. 908.01(4)(b)5.

The defendant alleges under the rationale of *Bruton v. United States, supra,* that it was plain error not to exclude the out of court statement. *Bruton* rests upon the principle that the introduction of a statement at a joint trial creates a substantial risk of prejudice that even a limiting instruction cannot cure. The theory of Bruton and subsequent cases[12] is that an extrajudicial statement of a co-conspirator is inherently unrealiable as there is a tendency to shift the culpability to the other conspirators;[13] thus, even with a limiting instruction a jury is likely to attribute the statement's revelations against the other party and not solely against the declarant. *Bruton* raises one additional aspect and as previously discussed, that is that there is a potential for the denial of confrontation when the extrajudicial declaration is admitted into evidence. While the statement is binding against the declarant, that co-conspirator cannot be forced to take the witness stand contrary to his Fifth Amendment right against self-incrimination. Therefore, in the joint trial context there is no way for the other co-conspirator to challenge the veracity of the statement's assertions.

We find the *Bruton* rationale inapplicable to this case. The holding in *Bruton v. United States, supra,* indicates at p. 135:

"Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error un-

[12] *U.S. v. Lyon,* 397 F.2d 505 (7th Cir. 1968), *cert. den. Lysczyk v, U.S.,* 393 U.S. 846, 89 S. Ct. 131, 21 L. Ed.2d 117 (1968).

[13] Joseph Levie, *"Hearsay and Conspiracy,"* 52 Mich. L. Rev. 1159, 1173 (1954).

avoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. . . . It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information."

This is not a case where the statement has inadvertently crept in, rather the statement was introduced probably as a trial tactic through the combined efforts of the defendant's and co-defendant's defense counsel. The record indicates that the statement was introduced as part of the prosecution's case by agreement of both defense counsels in the consolidated trial previously referred to. No objection was made to its reading until the final paragraph was deleted from consideration by the prosecution. The final paragraph of the statement contained Neeley's stated desire to take a polygraph examination. The trial court agreed with the state and based its ruling upon a pre-trial order excluding polygraph reference from the trial, pursuant to the authority of *State v. Stanislawski,* 62 Wis.2d 730, 216 N.W.2d 28 (1974). The trial court correctly denied the defendant's motion for a new trial and in finding that it was not error to exclude any reference to the polygraph examination. The agreement to introduce the statement containing the polygraph reference was a calculated trial tactic to open the door on the polygraph issue. The defendant cannot claim prejudice because the tactic backfired, especially in light of the pre-trial order of exclusion. Further, we find that there was no denial of confrontation as the declarant Neeley took the stand and subjected himself to the potential for free and open cross-examination by defendant's counsel. There is no confrontation clause problem when pursuant to a hearsay exception and the agreement of defense counsel a prior statement can be testified to by the declarant while under oath subject to cross-examination and where the declarant's demeanor can be observed by the trier of fact. *Dutton v. Evans, supra*

at 88–89. The co-defendant's testimony meets the constitutional requirements of the confrontation clause in its interplay with the hearsay rule. *Dutton v. Evans, supra.*[14] Additionally, Neeley's statement was not factually prejudicial to the defendant as the statement was consistent with the defendant's withdrawal defense. On this point, we find without merit the defense contention that the admission of the statement forced both defendants to take the stand. If Neeley and Bergeron had not testified, neither defendant could have established affirmative acts constituting a withdrawal defense. The incriminating portions of Neeley's statement were rendered without prejudicial effect as to the defendant when Neeley substantially verified the accuracy of his statement through his in-court admissions. The in-court admissions of co-conspirators are binding upon the other parties. Neeley's courtroom testimony concerning matters pertaining to the conspiracy meets the circumstantial guarantees of trustworthiness promoted by the hearsay rule and the confrontation clause. Therefore, we hold the admission of Neeley's post-arrest statement to be harmless error.

In consideration of the third issue raised in this appeal, the state claimed it was error for the trial judge to require the prosecution to choose between sub. (b) and sub. (c) of sec. 939.05, Stats. These subsections deal with the aider and abettor definition and the subsection applicable to conspiratorial activities. This argument was raised by the state in the event that a new trial would be ordered. Having found no reason to grant a new trial to the defendant, we accordingly do not reach the issue.

*By the Court.*—Judgment and order affirmed.

---

[14] "The decisions of this Court make it clear that the mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.' *California v. Green,* 399 U.S., at 161." *Id.* at 89.