66 A.3d 1049

**Deangelo Ferdale SAVAGE**

v.

**STATE of Maryland.**

**No. 1741 Sept. Term 2011.**

Court of Special Appeals of Maryland.

May 29, 2013.

2

4

Lisa J. Sansone, Baltimore, MD, for Appellant.

Todd W. Hesel, (Douglas F. Gansler, Attorney General, on the brief), Baltimore, MD, for Appellee.

Panel: MEREDITH, WOODWARD, JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

KENNEY, J.

Deangelo Ferdale Savage, appellant, was tried before a jury in the Circuit Court for Wicomico County and convicted of various offenses arising out of his involvement in a burglary that occurred on December 17, 2010. In his timely appeal, appellant presents three questions for our review, which we have expanded into four and rephrased as follows:

1. Did appellant's two convictions for conspiracy to commit first-degree burglary offend double jeopardy principles?

2. Did the trial court err in not merging the conviction for *accessory* to first-degree burglary with the conviction(s) for *conspiracy* to commit first-degree burglary?

3. Did the trial court err in restricting the cross-examinations of Demarics Banks and Sergeant Chastity Blades?

4. Did the trial court err in admitting evidence that the occupant of the burglarized home was killed?

For the reasons that follow, we shall affirm in part and remand in part the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

Reginald Greene lived at 1704 Dale Lane in Salisbury, Maryland ("the Greene home") with his sister Barbara Greene. When he returned home at approximately midnight on December 17, 2010, he noticed that "the back door was busted open." Walking into the living room, he saw clothes "spread out in the hallway" and "a little blood." Continuing into the kitchen, he found a rug that had been "pushed over," and saw snow and footprints on the floor near the back door. He left the house and called the police, who responded and searched the Greene home. When Mr. Greene later returned to the house, he observed that the upstairs bedrooms were "tore up"—"[t]he doors was off the hinges," "boxes and stuff was ransacked," and "[t]he drawers was out, busted up."

Sergeant Scott Cook, who responded to Mr. Greene's call, testified that the living room was "very neat" and the kitchen was "undisturbed," but described Mr. Greene's bedroom as "ransacked. The drawers were pulled out, emptied, the closet doors were open, stuff was pulled out all over the floor." Ms. Greene's bedroom "wasn't nearly as ransacked," but it appeared that somebody had "done a cursory-type search." According to Sergeant Cook, Demarics Banks and Shawn Franklin "were the first two suspects that were developed," and, later, appellant was developed as the third.

On December 23, 2010, Detective Chris Taylor[1] and Detective Tingle[2] interrogated appellant at the Wicomico County's Sheriff's Office. During that interrogation, according to Detective Taylor, appellant "was indicating that he didn't know

---

1. Detective Taylor is also identified in the record as Corporal Taylor.

2. The record does not reflect Detective Tingle's first name.

. . . who we were talking about" and that he "had no involvement whatsoever."

Sergeant Steve Hall testified that he watched the detectives' interrogation "from another room." After it was over, he and Sergeant Chastity Blades had an impromptu conversation with appellant, which he recounted to the prosecutor at trial:

[Sergeant Hall]: I believe [appellant] said that he had talked to Demarics Banks and Shawn Franklin about committing a burglary at [the Greene home].

\* \* \*

He said that Banks and Franklin were pushing him to take them to where the [Greene home] was . . . .

[Prosecutor]: Did he acknowledge that he had assisted them in planning the burglary?

[Sergeant Hall]: Yes.

[Prosecutor]: Did he acknowledge that he and [Tavonne Clark–Smith, who dated appellant after ending a romantic relationship with Mr. Greene,] took [Banks] to show them where the [home] was located?

[Sergeant Hall]: Yes, they actually rode by the [home] and he identified the [home] for Banks and Franklin.

[Prosecutor]: Did he say anything with respect to his involvement in the burglary?

[Sergeant Hall]: He wasn't involved in the burglary. He said that he had backed out at the last minute before they went and actually committed the burglary.

Regarding that same conversation, Sergeant Blades testified:

[Appellant] at first, denied any involvement in the burglary, and then admitted that he had contact with both Demarics Banks and Shawn Franklin, about committing the burglary. More so with Demarics Banks and that they had agreed that there would be a burglary, that would occur, that no one was supposed to be home. There wasn't an agreement as to what portion he would get of the burglary, but there

was an agreement that he would get something out of the burglary.

* * *

He further went on to say that Tavonne Clark–Smith had dated, I believe, it was Reginald Greene and that Demarics Banks and Shawn Franklin knew that she had dated him and ... believed that ... she would know where he lived and wanted her to ... drive them by there.

[Prosecutor]: Did he acknowledge that she did, in fact, do that?

[Sergeant Blades]: Yes, he did.

[Prosecutor]: Did he acknowledge that he was present when that occurred?

[Sergeant Blades]: Yes, he did.

[Prosecutor]: Did he say anything to you about trying to change his mind?

[Sergeant Blades]: He said that he did change his mind but that he did not relay that to Demarics Banks or Shawn Franklin. He said that he had changed his mind prior to the burglary occurring but that he had not relayed that to anyone.

Clark–Smith testified that appellant "kept asking [her] over and over and over again" where Mr. Greene lived, but she never asked why he wanted to know. Finally, during a car ride a few weeks before the burglary, she pointed out the location of the Greene home to appellant and Banks.[3]

Banks, who cooperated as a State's witness in accordance with a plea agreement, testified:

- "the plan to burglarize the [Greene] home" was "originally between [appellant] and [Franklin]";

- Banks did not "get any of the information about the [Greene home] and the money"—including the location of the Greene home, the amount of money therein

---

3. According to Clark–Smith, Franklin was not present during this car ride.

(approximately $65,000), or the exact location of that money (in the "[b]ottom drawer of [a] dresser")—"from anybody other than" appellant,[4] with whom he "discussed" the burglary plan "[o]nce or twice" and with whom he would "split that money";

- Clark–Smith had pointed out the location of the Greene home when she, he, and appellant had driven by it;
- appellant "asked [him] to do" the robbery, but Banks did not "let [appellant] know that" he was "going to do it that night." Instead, he "called [Franklin]," and they agreed that they would just "tell [appellant] when [they] did it";
- Franklin already knew about the Greene home and the money, but Franklin didn't tell him that until "after the fact"; and
- he and Franklin together burglarized the Greene home. Afterwards, they went to appellant's home and told appellant that the burglary had been unsuccessful.

Franklin, appellant's only witness, testified that: (1) he received his information about the burglary from Banks; (2) he never discussed the burglary with appellant; and (3) appellant did not play "any role in this burglary." On cross-examination, the prosecutor questioned Franklin about contradictions between this testimony and statements he had made during a December 23, 2010 interview with Detective Taylor. In that interview, the transcript of which was entered into evidence, Franklin stated that:

- there was a conversation in which Clark–Smith "told me there's a lot of cash somewhere." Franklin asked appellant, who he knew as "D,"[5] "so you going to put me on to that, what you was talking about? [Appellant] was like no, you got to give me some time.... I was keeping

---

4. Banks testified that he "didn't get [his] information from" Franklin.

5. At trial, Clark–Smith and Banks testified that appellant went by the nickname "D."

asking, but he never—you know, but then like down the line, he ... told Banks and shit";

- he "kn[e]w nothing about" money being inside the Greene home until he "and Banks talked about it Wednesday[, December 15, 2010] by ourselves" at 407 Hastings Street, which Franklin identified as appellant's residence. According to Franklin, Banks had stated that appellant had told Banks about the money;

- on Thursday, December 16,[6] there was another conversation at 407 Hastings Street among Franklin, Banks, *and appellant* regarding the robbery plan. According to Franklin, appellant "didn't really say nothing, only—but only about the cash. He's saying, yeah, it's there, where it was at and everything.... It was right—it's in the bottom of the drawer where all the envelopes and stuff at";

- the robbery was originally planned for Thursday night, "[b]ut I had to ... babysit my son the whole night, so we didn't do nothing";

- appellant "wasn't going to" participate in the actual robbery attempt, and thus, although appellant "probably knew [the burglary] was going to go down," "[h]e probably ain't know for real" exactly when it was going to occur;

- although appellant had instructed Banks "to go by himself" on the robbery, Banks "took [Franklin] anyway" on Friday, December 17, without telling appellant. "But at first he wouldn't take me because he had to break off [appellant]. But he was like, fuck it, he just break it off on his half." In other words, Banks and Franklin were going to "split it down the middle," and "Banks was going to give [appellant] out of his cut" in return for the information about the Greene home; and

---

6. Franklin later stated that he was not present for this conversation, but that Banks had told him about it.

- after the robbery attempt, Banks and Franklin went to 407 Hastings Street, and appellant was "angry because he thought we got something[.]"

Appellant was convicted of: (1) two counts of conspiracy to commit first-degree burglary (2) two counts of conspiracy to commit third-degree burglary, (3) one count of accessory before the fact to first-degree burglary, and (4) one count of accessory before the fact to third-degree burglary. For sentencing purposes, the court merged the two third-degree burglary-conspiracy convictions into the two first-degree burglary-conspiracy convictions, and merged the third-degree burglary-accessory conviction into the first-degree burglary-accessory conviction. Thus, when "the dust settled," sentencing was based on two convictions for conspiracy to commit first-degree burglary (one conspiracy between appellant and Franklin, and another conspiracy between appellant and Banks) and a conviction for accessory to first-degree burglary. Appellant was sentenced to consecutive eight-year terms for each of those three remaining convictions. Further facts shall be introduced as required for our analysis.

## DISCUSSION

### *Conspiracy*

A criminal conspiracy is "the combination of two or more persons, who by some concerted action seek to accomplish some unlawful purpose, or some lawful purpose by unlawful means." *Mason v. State,* 302 Md. 434, 444, 488 A.2d 955 (1985).[7] As Judge Moylan has reminded us, conspiracy is a "common law crime" that "arrived in our then proprietary colony as part of the unseen cargo of the Ark and the Dove." *Rudder v. State,* 181 Md.App. 426, 432, 956 A.2d 791 (2008). At common law, conspiracy "is complete without any overt

---

7. Criminalization of conspiracy provides a "sanction against group activity" because group activity "increases the danger to society, for . . . the group is more likely to be able to bring about the criminal result" than the individual. *Carroll v. State,* 428 Md. 679, 699, 53 A.3d 1159 (2012).

act" to advance its goal, *Mason,* 302 Md. at 444, 488 A.2d 955, and is "a crime at the moment the agreement is formed[.]" Paul Marcus, *Conspiracy: The Criminal Agreement, in Theory and in Practice,* 65 Geo. L.J. 925, 930 (1977).

The "unit of prosecution"[8] for conspiracy is "the agreement or combination, rather than each of its criminal objectives." *Tracy v. State,* 319 Md. 452, 459, 573 A.2d 38 (1990). "A single agreement . . . constitutes one conspiracy," and "multiple agreements . . . constitute multiple conspiracies." *United States v. Broce,* 488 U.S. 563, 570–71, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989). In other words, the conviction of " 'a defendant for more than one conspiracy turns on whether there exists more than one unlawful agreement.' " *United States v. Nyhuis,* 8 F.3d 731, 734 (11th Cir.1993) (quoting *United States v. Cochran,* 883 F.2d 1012, 1016 (11th Cir.1989)).

It is the State's position that it "presented evidence that [appellant] made two *separate* agreements—one with Banks, and one with Franklin—to burglarize" the Greene home, and therefore appellant "properly received separate punishments for *separate* conspiracies." (Emphasis added). Appellant contends that any agreements he made with Banks and Franklin were part of one *overall* conspiracy to burglarize the Greene home, and thus he is being punished twice for the same crime in violation of the prohibition against double jeopardy.

As appellant contends, multiple agreements can be part of a single conspiracy, *State v. Choppy,* 141 N.C.App. 32, 40, 539 S.E.2d 44 (2000), because "[a] single conspiracy can include subgroups or subagreements[.]" 16 Am.Jur.2d Conspiracy § 36; *United States v. Patterson,* 819 F.2d 1495, 1502 (9th Cir.1987). The context of the case being prosecuted will determine which side—prosecution or defense—argues that there is only one agreement or conspiracy. *See United States v. Abbamonte,* 759 F.2d 1065, 1068 (2d Cir.1985) ("Whether a defendant's criminal activities establish his participation in one

---

**8.** The unit of prosecution is the "aspect" of a crime that was "intended" to be "punish[ed]." *United States v. Chipps,* 410 F.3d 438, 448 (8th Cir.2005).

large conspiracy or two separate conspiracies is an issue on which prosecutors and defense counsel have often changed positions 'as nimbly as if dancing a quadrille.' ") (quoting *Orloff v. Willoughby,* 345 U.S. 83, 87, 73 S.Ct. 534, 97 L.Ed. 842 (1953)).

 The prosecution may charge multiple conspiracies with "the hope that the defendant(s) would receive heavier sentences[.]" *United States v. Cerro,* 775 F.2d 908, 910 (7th Cir.1985). But, perhaps counterintuitively, it is "[m]ore often" the case that "it is the [prosecution] that is arguing for a single overarching conspiracy," *id.,* in order "to introduce the acts and statements made by co-conspirators in a transaction against individuals involved in an entirely separate transaction by relying upon the co-conspirators' exception to the hearsay rule." *Bolden v. State,* 44 Md.App. 643, 650, 410 A.2d 1085 (1980). The prosecution takes that approach "when more than two conspirators are jointly tried, some of the conspirators are not known to the other conspirators, and a single all-encompassing conspiracy is charged." Paul Marcus, *Prosecution and Defense of Criminal Conspiracy Cases* § 4.02[2], at 4–11 (2012). In that situation, the defendant may contend that there were multiple conspiracies and his involvement was limited to only one smaller conspiracy, *see Iannelli v. United States,* 420 U.S. 770, 784, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975); *United States v. Prince,* 515 F.2d 564, 567 (5th Cir.1975), and advance a variance argument. *See Abbamonte,* 759 F.2d at 1068 (When a defendant "urges that, though the indictment alleged one conspiracy, the evidence showed at least two," he may "challenge [the] conviction on the ground of variance[.]").[9]

 The State has the burden to prove the agreement or agreements underlying a conspiracy prosecution. *See* Albert

---

9. "A variance has been defined as 'a difference between the allegations in a charging instrument and the proof actually introduced at trial.' " *Crispino v. State,* 417 Md. 31, 51, 7 A.3d 1092 (2010) (quoting Black's Law Dictionary 1692 (9th ed.2009)). "When there is a material variance between the *allegata* and the *probata,* the judgment must be reversed." *Green v. State,* 23 Md.App. 680, 685, 329 A.2d 731 (1974) (citation omitted).

J. Harno, *Intent in Criminal Conspiracy,* 89 U. Pa. L. Rev. 624, 632 (1941) (prosecution must "prove as laid[ ] the agreement on which" a particular conspiracy charge is based). If the prosecution seeks to establish a single conspiracy, it has the burden "to prove the existence of 'one overall conspiracy ... *as opposed to separate and independent conspiracies.*' " *United States v. Trainor,* 477 F.3d 24, 35 (1st Cir.2007) (emphasis added). If it seeks to establish multiple conspiracies, it "has the burden of proving a *separate* agreement for each conspiracy." 16 Am Jur 2d Conspiracy § 40 (emphasis added).[10]

When a defendant "contends that only one conspiracy exists, while the [prosecution] insists there are at least two," he "challenges [his] conviction[s] on the ground of double jeopardy[.]" *Abbamonte,* 759 F.2d at 1068. The theory underlying the double jeopardy challenge is that, "[t]o convict [him] severally for being part of two conspiracies when in reality he is only involved in one overall conspiracy would be convicting him of the same crime twice." *United States v. Palermo,* 410 F.2d 468, 470 (7th Cir.1969) (citations omitted).[11]

---

**10.** In many jurisdictions, when the government "reindicts a defendant acquitted (or convicted) on [a prior] conspiracy charge," a situation that "arise[s] more commonly" than charging "multiple conspiracies in the same case," *United States v. Cerro,* 775 F.2d 908, 913 (7th Cir.1985) (emphasis added), the "burden" does not "shift[ ] to the prosecution to show, by a preponderance of the evidence, that there are in fact two distinct conspiracies," *unless* the defendant "makes a non-frivolous showing" that the evidence supports only one conspiracy. *United States v. Lopez,* 356 F.3d 463, 467 (2d Cir.2004) (per curiam); *see, e.g., United States v. Inmon,* 568 F.2d 326, 331–32 (3d Cir.1977); *United States v. Booth,* 673 F.2d 27, 30 (1st Cir.1982); *United States v. Loyd,* 743 F.2d 1555, 1562–63 (11th Cir.1984).

**11.** The Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution, which states, "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb," "provides the criminally accused with protection from, *inter alia,* multiple punishment stemming from the same offense," regardless of whether the offense arises from statute or from common law. *Purnell v. State,* 375 Md. 678, 690–92, 827 A.2d 68 (2003). The double Jeopardy Clause was made applicable to the states by the Fourteenth Amendment; "despite the lack of a double jeopardy clause in its Constitution, Maryland's

To be sure, determining the number of conspiracies and distinguishing one agreement from another is a "challenge" with which "[c]ourts have long wrestled." Anne Bowen Poulin, *Double Jeopardy Protection from Successive Prosecution: a Proposed Approach*, 92 Geo. L.J. 1183, 1274 n. 507 (2004). This is, in part, because "[t]he Supreme Court has not ... established in the double jeopardy context how to determine whether there was one agreement or more than one agreement," William H. Theis, *The Double Jeopardy Defense and Multiple Prosecutions For Conspiracy*, 49 SMU L.Rev. 269, 286 (1996), and because conspiracy law is often "a veritable quicksand of shifting opinion and ill considered thought." Francis B. Sayre, *Criminal Conspiracy*, 35 Harv. L.Rev. 393, 393 (1922).

■ To address the single as opposed to multiple conspiracies question, it is "necessary to analyze the nature of the agreement" or agreements, *Mason v. State*, 302 Md. 434, 445, 488 A.2d 955 (1985), and to ask, when there are agreements among several parties, "whether there was 'one overall agreement' to perform various functions to achieve the objectives of the conspiracy,'" or separate conspiracies. *United States v. Arbelaez*, 719 F.2d 1453, 1457 (9th Cir.1983) (quoting *United States v. Zemek*, 634 F.2d 1159, 1167 (9th Cir.1980)). In making that determination, some courts consider the "totality of the circumstances" in their analysis. *United States v. Fenton*, 367 F.3d 14, 19 (1st Cir.2004); *United States v. Smith*, 450 F.3d 856, 860 (8th Cir.2006). Justice Blackmun has observed that courts "have looked to a number of discrete factors. Some of these include the relevant (1) time, (2) participants, (3) ... offenses charged, (4) overt acts charged, and (5) places where the alleged acts took place." *United States v. Broce*, 488 U.S. 563, 585 n. 2, 109 S.Ct. 757, 102

---

common law [also] provides protection from double jeopardy to the criminally accused." *Id.* at 691, 827 A.2d 68. Today, a limitation on the punishment for conspiracy is imposed by statute. *See* Md.Code, Crim. Law § 1–202 ("The punishment of every person convicted of the crime of conspiracy shall not exceed the maximum punishment provided for the offense he or she conspired to commit.").

L.Ed.2d 927 (1989) (Blackmnun, J., dissenting) (citations omitted).

In the multiple conspiracy context, the agreements are "distinct," *Manuel v. State*, 85 Md.App. 1, 12, 581 A.2d 1287 (1990), and "independent" from each other, *Timney v. State*, 80 Md.App. 356, 368, 563 A.2d 1121 (1989), in that each agreement has "its own end, and each constitutes an end in itself." *United States v. Sababu*, 891 F.2d 1308, 1322 (7th Cir.1989) (citing *Blumenthal v. United States*, 332 U.S. 539, 558–59, 68 S.Ct. 248, 92 L.Ed. 154 (1947)). If the prosecution fails to present "proof sufficient to establish a second conspiracy," it follows that "there [is] merely one continuous conspiratorial relationship," *Vandegrift v. State*, 82 Md.App. 617, 646, 573 A.2d 56 (1990), or one "ongoing criminal enterprise," *Rudder v. State*, 181 Md.App. 426, 448–49, 956 A.2d 791 (2008), that is "evidenced by" the multiple acts or agreements "done in furtherance of it." *Greenwald v. State*, 221 Md. 245, 250, 157 A.2d 119 (1960); *see Bergeron v. State*, 85 Wis.2d 595, 608, 271 N.W.2d 386 (1978) ("It is not unusual for a conspiracy to require successive steps before its unlawful objective is accomplished.").

Although we have not been alerted to or found any cases in Maryland that directly address the issues before us, several inform our analysis. In *Tracy v. State*, 319 Md. 452, 573 A.2d 38 (1990), Tracy was found guilty of conspiracy to commit murder and conspiracy to commit robbery with a deadly weapon. On appeal,

> [t]he State contend[ed] that the evidence established two separate criminal conspiracies between Tracy and [Jordan]. The first was that Jordan would kill Purman with a knife, and they would take Purman's car and drive it west. The second conspiracy occurred during the commission of the crimes when Jordan was unable to stab Purman; the State contend[ed] that at that time there was a new agreement that Tracy would carry out the murder and robbery with a gun.

*Id.* at 459, 573 A.2d 38. The Court of Appeals saw instead "one continuous conspiratorial relationship . . . to commit robbery and murder," and held that "Tracy's and Jordan's decision to change which of the two participants would actually carry out the intended murder and to change the type of weapon to be used to commit the crimes would not be sufficient to constitute a second conspiracy." *Id.*[12]

In *Ezenwa v. State*, 82 Md.App. 489, 572 A.2d 1101 (1990), each defendant was charged with and convicted of "two distinct conspiracies: (1) to import heroin and (2) to distribute heroin." *Id.* at 498, 572 A.2d 1101. The defendants asserted on appeal that they were "prejudiced by the failure to dismiss one of the two counts of conspiracy and, therefore, that [the] convictions must be reversed." *Id.* at 499, 572 A.2d 1101. The State

> conceded that a single agreement underlay both conspiracy counts. It stated, however, that that agreement had two distinct objectives; hence, it maintained that, for that reason, the conspiracy was properly charged in two counts. In the State's view, both counts had to be submitted to the jury and, in the event that the jury found appellants guilty of both, their remedy lay in their being sentenced on only one.

*Id.* at 498, 572 A.2d 1101. The State also contended that because "each count contained a different element, *i.e.*, the different object of the conspiracy, they are not the same offense" under the required evidence test. *Id.* at 500, 572 A.2d 1101.

Reasoning that "the State conceded that a single agreement underlay both conspiracy counts," *id.* at 498, 572 A.2d 1101, we stated both that the convictions "ought to merge" for sentencing purposes, *id.* at 504, 572 A.2d 1101, and—noting that the same penalty was imposed for each conviction—that "one of

---

12. Although the *Tracy* mandate stated that Tracy's conviction for conspiracy to commit robbery with a deadly weapon must be "vacate[d]," 319 Md. at 460, 573 A.2d 38 in *Vandegrift v. State*, 82 Md.App. 617, 645, 573 A.2d 56 (1990), this Court spoke of *Tracy* in terms of merger ("[In *Tracy*,] the Court of Appeals held that Tracy's convictions for conspiracy to commit murder and conspiracy to commit robbery should merge.").

the conspiracy sentences must be vacated." *Id.* at 501, 572 A.2d 1101.[13] We also stated that although "the application of the required evidence test would indicate that the offenses are not the same, . . . they may very well be alternative modes of committing the single crime of conspiracy." *Id.* at 504, 572 A.2d 1101.

In *Vandegrift v. State,* 82 Md.App. 617, 573 A.2d 56 (1990), Vandegrift was convicted of conspiracy to distribute cocaine, conspiracy to distribute marijuana, and conspiracy to import cocaine. On appeal, he argued for the merger of these convictions for sentencing. We held that, "although distributing and importing controlled dangerous substances constitute distinct objectives," *id.* at 646, 573 A.2d 56, "the evidence [was] not sufficient to show the existence of separate conspiratorial agreements to distribute and import." *Id.* at 645, 573 A.2d 56. Thus, "in the absence of proof sufficient to establish a second conspiracy, there was merely one continuous conspiratorial relationship." *Id.* at 646, 573 A.2d 56. According to the Court, where the conspiracy sentencing statute "does not expressly relate to any substantive offense," and it is "unclear whether the Legislature intended that sentences be cumulative for different criminal acts that result from a single common law conspiracy," the rule of lenity would apply. *Id.* at 644, 573 A.2d 56.[14]

In *Manuel v. State,* 85 Md.App. 1, 581 A.2d 1287 (1990), two of the defendants, Aniunoh and Manuel, alleged that their convictions for conspiracy to possess and distribute *heroin* should merge with their convictions for conspiracy to possess and distribute *cocaine.* We disagreed and held that "the nature of the agreement among the members of the [heroin]

---

13. Although we stated that the convictions should *"merge,"* the mandate stated: "sentence for conspiracy to distribute heroin *vacated* [.]" 82 Md.App. at 518, 572 A.2d 1101 (emphasis added).

14. The mandate stated: "judgments and convictions for conspiracy to distribute cocaine and marijuana vacated." 82 Md.App. at 646, 573 A.2d 56.

drug ring" did not extend "to cocaine trafficking." *Id.* at 11, 581 A.2d 1287. We explained:

Of the thousands of telephone calls intercepted by the police and the numerous conversations recorded via Thomas' body wire, there are four distinct components of one cocaine transaction. In the course of a heroin deal which occurred on October 15, 1987, Aniunoh told Thomas that he could obtain some "girl," the street name for cocaine, if Thomas was interested. Aniunoh revealed possible sources in Virginia and in Atlanta. Aniunoh then contacted a possible supplier, Kingsley, in Mississippi, who disclosed his terms and invited Aniunoh to Mississippi to conclude the deal. Aniunoh also discussed with Manuel the terms of the cocaine supplier with whom the latter was familiar. Aniunoh then contacted Thomas to further negotiate the cocaine trafficking scheme.

While the conspiracy to distribute cocaine emanated from the heroin conspiracy, it was a separate, distinct agreement. The cocaine scheme was the offspring solely of conspirators Aniunoh and Manuel, whereas the heroin ring was the prodigy of Onwuneme, Ohakwe, Brewer, Aniunoh, Manuel and many others. The heroin conspirators did not broach the topic of cocaine distribution; rather their focus centered on heroin. The cocaine conspiracy is further distinguishable due to the use of different suppliers. The cocaine derived from a source in the southeast portion of the United States whereas the heroin primarily originated in Nigeria. Finally, the two conspiracies covered different periods of time. The heroin trafficking spanned from January 1987 through February 1988, approximately a thirteen-month period, while the cocaine conspiracy covered a two-month stretch between October 1987 and December 1987. Under these circumstances the cocaine conspiracy constituted a separate offense which does not warrant merger with the heroin conspiracy conviction.

*Id.* at 11–12, 581 A.2d 1287.

Looking beyond Maryland, it has been said that "the question of whether one or more than one conspiracy has been

established is a question of fact *for a properly instructed jury.*" *United States v. Maldonado-Rivera,* 922 F.2d 934, 962 (2d Cir.1990) (emphasis added). For example, in *United States v. Frierson,* 698 F.3d 1267 (10th Cir.2012), the defendant was convicted of, *inter alia,* conspiracy to distribute and possess with intent to distribute crack cocaine (count 11),[15] and conspiracy to distribute more than 50 grams of crack cocaine (count 28).[16]

The United States Court of Appeals for the Tenth Circuit held that the convictions violated double jeopardy, and remanded the case to the trial court "with instructions . . . to vacate Defendant's conviction and sentence on either Count 11 or Count 28." *Id.* at 1270. The court reasoned:

To establish that the two conspiracies charged in Counts 11 and 28 were distinct—that is, that the conspiracy convictions were not multiplicitous—the jury had to find the "existe[nce][of] more than one agreement to perform some illegal act or acts." To do so, the "jurors [had to be] adequately instructed that they could not find [Defendant] guilty of more than one count of conspiracy unless they were convinced beyond a reasonable doubt that he entered into two separate agreements to violate the law."

---

15. Count 11 charged:
 Beginning on a date unknown to the Grand Jury, and continuing through *March 30, 2007,* in the District of Kansas, [Defendant] and Cortez Grayson . . . did unlawfully, knowingly combine, conspire, confederate and agree together with others, both known and unknown to the Grand Jury, to distribute and possess with intent to distribute [crack cocaine].
 698 F.3d at 1269 (emphasis added).

16. Count 28 charged:
 Beginning on a date unknown to the Grand Jury, and continuing through the *27th day of June, 2007,* in the District of Kansas, and elsewhere, [Defendant, Grayson, and 12 other Crips members] . . . did knowingly, willfully and unlawfully combine, conspire, confederate and agree with . . . other persons whose identities are both known and unknown to the Grand Jury, to distribute fifty (50) grams and more of [crack cocaine].
 698 F.3d at 1269 (emphasis added).

In this case the jury was not so instructed, and according-ly it did not find that Defendant entered into two separate agreements to distribute crack cocaine. The instruction to the jurors that they "separately consider each defendant and each Count," did not alert them that they needed to find that the two conspiracies involved distinct agreements. And there was nothing in the government's closing argu-ment to suggest that the conspiracy alleged in Count 11 was anything other than part of the larger conspiracy alleged in Count 28, or that Defendant had two separate agreements to distribute illegal drugs. Thus, the two convictions on Counts 11 and 28 are plainly multiplicitous.

*Id.* at 1270.

In *Turnley v. State*, 725 N.E.2d 87 (Ind.2000), Turnley and Thacker discussed burglarizing the home of Anthony and Monique Hollowell. "Thacker proposed that they break into the Hollowells' home in the daytime when no one would be home. Thacker added that, if the men were unable to locate the money, they would return that evening and take Mo-nique's purse. Turnley agreed." *Id.* at 89. The next day, around noon, Turnley and Thacker broke into the house, but found no money. They decided to return later that night. When they did, they again found no money. But, after discovering Monique Hollowell asleep, they assaulted and murdered her.

Turnley was convicted of conspiracy to commit murder and two counts of conspiracy to commit burglary. On appeal, he argued that "one of his two conspiracy to commit burglary convictions . . . should be vacated because the evidence pre-sented at trial proved only one agreement," while the State argued that there were separate agreements. *Id.* The Su-preme Court of Indiana agreed with Turnley: "[t]he agree-ment was to attempt to locate the money during the afternoon, while Monique was at work, but it also contemplated returning that evening if the money could not be found." *Id.* at 90. The court also noted,

the jury was not instructed on the "one conspiracy, one conviction" rule. Rather, the trial court gave a single instruction defining the crime of "conspiracy." No other instruction suggested that the State needed to prove separate agreements to prove each separate conspiracy count. The jury may very well have been left with the impression that one agreement could support more than one conspiracy count.

*Id.* at 90 n. 2.

Although not a jury instruction case, we also find *United States v. Cerro*, 775 F.2d 908 (7th Cir.1985), instructive. Cerro was convicted

of five counts of conspiracy to distribute cocaine .... The [trial] judge gave him concurrent 15–year sentences on the first three conspiracy counts and consecutive 15–year sentences on the fourth and fifth conspiracy counts, for a total of 45 years.[17]

\* \* \*

Each of the alleged conspiracies was between Cerro and one other person, to whom Cerro consigned ("fronted") up to one ounce of cocaine each week for resale to users of cocaine. Each dealer would remit all or part of his retail sales revenues to Cerro, either retaining some of the revenues as compensation for his services or retaining some of the cocaine in lieu of money compensation.

On appeal, Cerro contended that the five conspiracies were "aspects of a single conspiracy." *Id.* at 910. Although there was "no direct evidence" that each dealer knew there were other dealers, which would indicate multiple conspiracies, *id.* at 914, the United States Court of Appeals for the Seventh Circuit held that Cerro was given an "illegal sentence." *Id.* at 912. Calling the lack of direct evidence "not surprising," given that "[i]t was no part of the government's purpose to

---

17. "Why the district judge imposed concurrent sentences for the first three conspiracies and consecutive ones for the last two is unclear." 775 F.2d at 910.

show an overarching conspiracy," *id.* at 914, the court reasoned that "the government should not be allowed to obtain a sentencing advantage from having failed at trial to explore the dealers' knowledge of the scope of the conspiracy in which each was involved," and "cannot shift, to a defendant fearful of more severe punishment, the burden of proving how much his coconspirators knew about the conspiracy." *Id.* at 913.

Here, there was testimony that, if credited by the jury, might establish, as a matter of law, two separate conspiracies. The following colloquy between Banks and the prosecutor at trial indicates that appellant sought out Banks *only after Franklin had backed out:*

Q. Were you originally the person that was supposed to commit the burglary?

A. No.

Q. Who was originally supposed to do it?

A. [Franklin].

\*　　\*　　\*

Q. *Did [appellant] tell you why [Franklin] wasn't doing it?*

A. No.

(Emphasis added).

On the other hand, the State, at trial, did not advance a two-conspiracy theory by seeking to prove that: (1) the conspiracy to burglarize the Greene home was originally between only Franklin and appellant, and that, when Franklin dropped out, the appellant-Franklin conspiracy terminated; and (2) then, when appellant joined with Banks in that same endeavor, a new conspiracy was created.[18]

Recognizing that "[i]t is impossible in the nature of things for a man to conspire with himself," *Morrison v. California,* 291 U.S. 82, 92, 54 S.Ct. 281, 78 L.Ed. 664 (1934), and, therefore, "the crime of conspiracy necessarily requires the

---

18. The evidence might also support a third conspiracy between Banks and Franklin to which appellant was not a party.

[agreement] of at least two people," *Gardner v. State*, 286 Md. 520, 524, 408 A.2d 1317 (1979), Judge Bazelon has explained: "[t]here may ... be a continuing conspiracy with a changing dramatis personae, *so long as there are never less than two conspirators*. A gap during which there is only one actor breaks the continuity." *Greene v. United States*, 246 F.2d 677, 680 (D.C.Cir.1957) (Bazelon, J., dissenting) (emphasis added). When such a gap occurs, the appearance of a new and different confederate with the remaining actor creates "a new and separate conspiracy." *Id.*

It has been said that "[a] conspiracy is presumed to continue until there is an affirmative evidence of abandonment, withdrawal, disavowal or defeat of the purposes of the conspiracy," *United States v. Little*, 753 F.2d 1420, 1448 (9th Cir.1984), *"even if the participants ... change over time* [.]" *United States v. Roach*, 164 F.3d 403, 412 (8th Cir.1998) (emphasis added).[19] But, it is necessary for one conspiracy to end before a second distinct and separate conspiracy can be formed. *See Bergeron v. State*, 85 Wis.2d 595, 608, 271 N.W.2d 386 (1978) (the end of one conspiracy "is inextricably bound to whether a second conspiracy was formed"). The question is whether there was a "break," for an "appreciable time, in the sequence of events," in order to "categorize" the agreements as "separate and distinct." *Purnell v. State*, 375 Md. 678, 698, 827 A.2d 68 (2003). As a practical matter, the fact that a conspirator in a two-person conspiracy seeks a

---

**19.** Because, at common law, conspiracy becomes a crime at the moment of the agreement, "withdrawal is not an affirmative defense to conspiracy." Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 12.4(b) at 310 (2d ed.2003); *see* Paul Marcus, *Conspiracy: The Criminal Agreement, in Theory and in Practice*, 65 Geo. L.J. 925, 965 (1977) ("Once the conspiracy has formed [the conspirator] may withdraw from it, but he will [still] be subject to a conspiracy charge."); *Cantine v. State*, 160 Md.App. 391, 411, 864 A.2d 226 (2004) ("ex-conspirator may remain liable for the original act of conspiring" even after he has withdrawn). This Court has held that, in order to "withdraw" from a conspiracy, the conspirator must affirmatively "act 'to defeat or disavow the purposes of the conspiracy.'" *Cantine*, 160 Md.App. at 411, 864 A.2d 226 (quoting *U.S. v. Urbanik*, 801 F.2d 692, 697 (4th Cir.1986)).

replacement for a departed would-be cohort is a strong indication of the failure of one conspiracy and the creation of another.[20]

 If a defendant is convicted of and sentenced for multiple conspiracies when, in fact, only one conspiracy was proven, the Double Jeopardy Clause has been violated. The foregoing authority persuades us that, under the facts of this case, one of appellant's two conspiracy convictions must be vacated to avoid this violation.[21] *See Jordan v. State,* 323 Md. 151, 160–61, 591 A.2d 875 (1991) (The imposition of two conspiracy sentences resulted in an "illegal sentence" under Rule 4–345(a) even though the defendant "(1) did not object to two conspiracy counts being submitted to the jury, (2) did not except to the conspiracy instructions actually given to the jury, and (3) even after the jury found him guilty of two conspiracies, did not make the contention he now makes on appeal with respect to [this] issue."). First, unlike the *Turnley* court, we are not prepared to say that there was clearly "only one agreement to commit a burglary" in this case. 725 N.E.2d 87, 90 (Ind.2000). But, we are persuaded that the jury instruction was inadequate to convict and sentence appellant of multiple conspiracies. The jury was instructed generally:

> Conspiracy is an agreement between two or more persons to commit a crime. In order to convict [appellant] of conspiracy, the State must prove, one, that [appellant] entered into an agreement with at least one other person to commit the crime; and two, that [appellant] entered into the agreement with the intent that the crime be committed. It

---

**20.** But, the creation of two successive conspiracies, under these circumstances, begs the question of whether the remaining conspirator *should* be punished twice. The remaining conspirator is the mutual party in agreements to "accomplish the same ends." *United States v. McMurray,* 680 F.2d 695, 699 (10th Cir.1981) (on rehearing *en banc* ). We are not required to reach that question in this case.

**21.** Although the foregoing authority from Maryland has, at times, used the words "merge" and "vacate" interchangeably in the conspiracy context, the mandates ordinarily have "vacated" one of the sentences.

is not necessary that a formal agreement be shown, nor that it be manifested by formal words, either written or spoken.

An agreement exists if the parties to a conspiracy tacitly come to an understanding with regard to an unlawful act or purpose. Both the agreement and the specific intent may be inferred from the surrounding circumstances.[22]

Without an instruction that the jury could not find appellant "guilty of more than one count of conspiracy unless [it] was convinced beyond a reasonable doubt that he entered into two *separate* agreements to violate the law," *United States v. Frierson,* 698 F.3d 1267, 1270 (10th Cir.2012) (emphasis added); *see also United States v. Swingler,* 758 F.2d 477, 492 (10th Cir.1985) (similar instruction to *Frierson* ), the State was not put to the test of proving separate conspiracies, and therefore it cannot be "allowed to obtain a sentencing advantage from having failed at trial to" do so. *United States v. Cerro,* 775 F.2d 908, 913 (7th Cir.1985). Without a proper instruction, "[t]he jury may very well have been left with the impression that one agreement could support more than one conspiracy count." *Turnley,* 725 N.E.2d 87 at 90 n. 2. We recognize that the jury was also instructed that it "must consider [each charge] individually and separately," but that general instruction was insufficient to "alert" the jury that it "needed to find that the two conspiracies involved distinct agreements." *Frierson,* 698 F.3d. at 1270.

In other words, without a clear instruction, there is no way to be certain that one or more jurors voting guilty did not see the appellant-Banks agreement and the appellant-Franklin agreement as one overall conspiracy among appellant, Banks, and Franklin to burglarize the Greene home. *United States v. Echeverry,* 698 F.2d 375, 377 (9th Cir.1983). We are not willing to "assume" that the jury was "so well informed" of conspiracy law's subtleties and the State's burden to prove two distinct conspiracies that it did not do just that. *Kotteakos v. United States,* 328 U.S. 750, 769, 66 S.Ct. 1239, 90 L.Ed. 1557

---

**22.** This instruction tracked the pattern instruction for conspiracy. *See* MPJI–CR 4.08.

(1946). In fact, the note sent by the jury during its deliberations, which stated "What is the difference between counts one and three, and counts two and four? They are the same.,"[23] indicates jury confusion regarding the conspiracy counts.

Second, as in *Frierson*, there was nothing in the State's opening or closing remarks to suggest to the jury that there were multiple conspiracies or that the appellant-Banks agreement was distinct from the appellant-Franklin agreement. During opening statements, the prosecutor stated that appellant and Banks

> plotted ... to go ahead with the burglary and *the agreement* was that [appellant] would not actually participate in going to the [Greene] home but that whatever Demarics Banks and Shawn Franklin retrieved from inside the [Greene home], he would get a cut of for giving them the information and showing them where the [home] was.

(Emphasis added). The prosecutor also twice referred to a "conspiracy"—rather than "conspiracies"—to burglarize the Greene home.

During closing arguments, the prosecutor stated, "[t]he conspiracy *count* requires that the State prove that [appellant] entered into an agreement with at least one other person. I would submit to you that he entered into *the agreement* with *both* [Franklin] and [Banks], but for conspiracy it only has to be one person." (Emphasis added).

If anything, the prosecutor's remarks suggest an agreement among appellant, Franklin, and Banks to burglarize the Greene home. In *Tracy v. State*, 319 Md. 452, 573 A.2d 38 (1990), to buttress its holding that Tracy's two convictions were part of the same conspiracy, the Court of Appeals "note[d] that during his closing argument, the prosecutor told

---

23. The verdict sheet given to the jury originally stated:
- Count one: "Conspiracy to Commit First Degree Burglary";
- Count two: "Conspiracy to Commit Third Degree Burglary";
- Count three: "Conspiracy to Commit First Degree Burglary"; and
- Count four: "Conspiracy to Commit Third Degree Burglary."

the jury 'our contention is that Tracy entered into *an* agreement with Jordan to commit these various crimes.' " *Id.* at 460, 573 A.2d 38.

Third, as in *Cerro,* the State did not concern itself with proving separate conspiracies. In fact, although the indictment contained separate conspiracy counts as to Banks and as to Franklin,[24] it was not until the jury note raised the issue that there was even a hint of the State's interest in proving separate conspiracies. In response to the question posed in that jury note, the verdict sheet, with the consent of both counsel, was amended in handwriting as follows:

- Count one: "Conspiracy to Commit First Degree Burglary *w/ Demarics Banks* ";
- Count two: "Conspiracy to Commit Third Degree Burglary *w/ Demarics Banks* ";
- Count three: "Conspiracy to Commit First Degree Burglary *w/ Shawn Franklin* "; and
- Count four: "Conspiracy to Commit Third Degree Burglary *w/ Shawn Franklin.*"

(Emphasis added). The court also indicated that it would send a response to the jury stating: "Counts One and two charge [appellant] as to Banks. Counts three and four charge [appellant] as to Franklin."

The court later announced on the record:

Because there was a suggestion of confusion by the jury through the question they presented, the Court did meet with both the State and the defense and agreed to amend the verdict sheet, so that it showed conspiracy—let's take

---

**24.** The indictment contained, *inter alia,* the following charges:
- Count 1: conspiracy to commit first-degree burglary "with Demarics Banks"
- Count 2: conspiracy to commit third-degree burglary "with Demarics Banks"
- Count 3: conspiracy to commit first-degree burglary "with Shawn Franklin"
- Count 4: conspiracy to commit third-degree burglary "with Shawn Franklin"

count one, conspiracy to commit first-degree burglary. We added the words, with the coconspirator's name. We did that for each of the first four counts, or each of the counts involved in their question so that it was clear.

The amendment of the verdict sheet to designate in each count the person with whom appellant conspired in no way addressed the single or multiple conspiracies issue and the State's obligation to prove two separate conspiracies.

Moreover, while the jury could have credited Banks's testimony indicating that appellant sought out Banks *only after Franklin had backed out*, the following evidence would also support a finding that appellant, Banks and Franklin were part of *one* conspiracy:

- Sergeant Hall testified that appellant said that:
 - "he had talked to Demarics Banks and Shawn Franklin about committing a burglary at [the house]";
 - "Banks and Franklin were pushing him to take them to where the house was";
 - he "assisted" Banks and Franklin in planning the burglary; and
 - "he identified the house for Banks and Franklin"; [25]
- Sergeant Blades testified that appellant said that:
 - "he had contact with both Demarics Banks and Shawn Franklin, about committing the burglary"; and
 - Clark–Smith had driven appellant, Banks, and Franklin to see the Greene home;
- Banks testified and Franklin stated during his interview that, when the burglary was over, Banks and Franklin went to appellant's house and told appellant what had happened; and

**25.** Clark–Smith testified that, during a drive with appellant and Banks *only,* she pointed out the location of the Greene home. Banks also testified that, during a drive with appellant and Clark–Smith, Clark–Smith pointed out the location of the Greene home.

- Franklin stated during his interview that he, appellant, and Banks jointly discussed the robbery plan on Thursday, December 16, 2010.

Had (1) the jury been properly instructed, (2) a two-conspiracy argument been advanced by the State, and (3) the jury found either a single conspiracy or multiple conspiracies, we would, in a sufficiency review, review the evidence in the light most favorable to the jury's verdict. Under the circumstances present in this case, we cannot do so. Therefore, one of appellant's conspiracy convictions must be vacated. *See Ezenwa v. State,* 82 Md.App. 489, 504, 572 A.2d 1101 (1990) ("Since . . . the same penalty was assessed for both [conspiracy convictions], we may vacate one of the convictions and allow the other to stand.") [26]

### *Accessory*

Appellant argues that, under either the required evidence test or for "fundamental fairness," his conviction for accessory before the fact to first-degree burglary should merge with his one remaining conviction for conspiracy to commit first-degree burglary. The State responds that "[i]t is well settled law in

---

**26.** We are persuaded, based on our review of subsequent case law in Maryland and elsewhere, that *Bell v. State,* 48 Md.App. 669, 429 A.2d 300 (1981), cannot be reconciled. There, Bell "appealed her convictions of conspiracy to batter and conspiracy to murder" her husband. *Id.* at 671, 429 A.2d 300. Bell contended "that the court erred in refusing to merge [her] separate convictions of conspiracy to batter and conspiracy to murder." *Id.* at 680, 429 A.2d 300. This Court disagreed, reasoning that "[t]here was evidence . . . clearly indicating that there were two *separate* and *distinct* conspiracies; the first to have Mason beat [Bell's] husband (which was subsequently abandoned) and the second (subsequently accomplished) to kill her husband." *Id.* (emphasis added). It appears that the initial agreement to beat the husband and the subsequent agreement to kill the husband were the offspring of *one* conversation. *See Bell v. State,* 286 Md. 193, 194 n. 2, 406 A.2d 909 (1979) ("Mason testified that Mrs. Bell had requested him, for a price, to beat up her husband. Ultimately they reached an agreement whereby he was to kill her husband for $5,000 and a Corvette automobile."). "[U]nder Maryland common law, irrespective of the number of criminal goals envisioned by a single criminal agreement, the conspirator is usually subject to but one conspiracy prosecution." *Mason v. State,* 302 Md. 434, 445, 488 A.2d 955 (1985).

Maryland that convictions for accessory before the fact and conspiracy do not merge under the required evidence test," and that, based on appellant's "instrumental role in the completion of the substantive offense ... there is nothing fundamentally unfair about punishing [him] separately for his agreements with Banks and Franklin to commit the burglary, and for his role in the consummated offense."

Accessory before the fact to first-degree burglary requires proof that the defendant *"aided, counseled, commanded, or encouraged"* another to commit a burglary, *"without* having been present either actually or constructively at the moment of perpetration." *State v. Williams,* 397 Md. 172, 193, 916 A.2d 294 (2007) (citations omitted) (emphasis added). Because "accessoryship" is a "mechanism by which culpability for the substantive crime is incurred," a "completed crime is a necessary element." *Grandison v. State,* 305 Md. 685, 759, 506 A.2d 580 (1986). Conspiracy to commit first-degree burglary requires an agreement to commit the burglary, but it does not require proof that an actual or attempted burglary occurred. Thus, because each crime contains an element that the other does not, appellant's accessory conviction does not, under the required evidence test, merge with his one remaining conspiracy conviction. *See State v. Lancaster,* 332 Md. 385, 391, 631 A.2d 453 (1993) ("if each offense contains an element which the other does not, there is no merger under the required evidence test even though both offenses are based upon the same act or acts"); *Grandison,* 305 Md. at 759, 506 A.2d 580 ("[E]ach of these crimes requires an element distinct from the other. Conspiracy to murder requires an agreement, while murder, regardless of whether one is convicted as an accessory or a principal, requires the completed crime. Thus it is apparent that the conspiracy to murder is a separate and distinct crime from the substantive crime itself.").

As to his "fundamental fairness" argument, appellant, citing *Monoker v. State,* 321 Md. 214, 582 A.2d 525 (1990), contends that

in the present case, accessory before the fact is an integral component of the alleged conspiracy. The same acts that formed the accessory before the fact formed the conspiracy. Therefore, it would be fundamentally unfair to sentence appellant for both crimes. As such, appellant's sentence for accessory before the fact should be merged into the conspiracy sentence[.]

In *Monoker*, the Court of Appeals held that fundamental fairness required the merging of the defendant's convictions for *solicitation* to commit daytime housebreaking and *conspiracy* to commit the same because the conspiracy "ripen[ed] from" the solicitation, such that "solicitation was part and parcel of the ultimate conspiracy and thereby an integral component of it[.]" *Id.* at 223, 582 A.2d 525.

Assuming, without deciding, that consideration of fundamental fairness was preserved for appellate review—we are not persuaded that merger was required under the fundamental fairness doctrine. *See Pair v. State*, 202 Md.App. 617, 649, 33 A.3d 1024 (2011) ("We decline, however, to review the issue of merger pursuant to the so-called 'fundamental fairness' test because we do not believe that it enjoys the procedural dispensation of Rule 4–345(a). We do not believe that a non-merged sentence pursuant to such a fluid test dependent upon a subjective evaluation of the particular evidence in a particular case is an inherently 'illegal sentence' within the tightly limited contemplation of the rule.").

Appellant's conspiracy and accessory convictions address, in our view, two different aspects of the burglary: the agreement to burglarize the Greene home with one or more persons, and the specific acts taken prior to and towards its commission. Regarding the latter, in this case, appellant "kept asking [Clark–Smith] over and over and over again" to show him the Greene home and he personally, along with Clark–Smith, took Banks and/or Franklin to show them the home before the burglary. *See Coleman v. State*, 209 Md. 379, 384–85, 121 A.2d 254 (1956) ("To be an aider or abettor it is not essential that there be a prearranged concert of action," *i.e.*, an agree-

ment, "although, in the absence of such action, it is essential that he should in some way advocate or encourage the commission of the crime."). These actions were important to success of the burglary and exceeded mere planning.[27] In doing so, appellant clearly aided, counseled and encouraged the burglary.

### Cross-examination

"The Confrontation Clause of the Sixth Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights guarantee a criminal defendant the right to confront the witnesses against him." *Martinez v. State*, 416 Md. 418, 428, 7 A.3d 56 (2010). Subsection (a)(4) of Maryland Rule 5–616 ("Impeachment and rehabilitation—Generally") states: "The credibility of a witness may be attacked through questions asked of the witness, including questions that are directed at ... [p]roving that the witness is biased, prejudiced, interested in the outcome of the proceeding, or has

---

**27.** Recently, in *Carroll v. State*, 428 Md. 679, 53 A.3d 1159 (2012), the Court of Appeals concluded that fundamental fairness did not require merger of *attempt* to commit armed robbery and *conspiracy* to commit armed robbery because the "conspiracy sentence addressed the 'planning' of the crime[.]" *Id.* at 697, 53 A.3d 1159 (quoting *Wooten–Bey v. State*, 76 Md.App. 603, 630, 547 A.2d 1086 (1988)). In *Wooten–Bey*, this Court, in a merger analysis of conspiracy to commit armed robbery and attempt to commit armed robbery, stated that the "crimes and penalties address different criminal behavior[.]" 76 Md.App. at 629, 547 A.2d 1086. We expressly noted that "[t]he gist of the common law crime of conspiracy is the unlawful combination to commit a criminal act—no overt act is required." *Id.* We provided no factual predicate for the statement that the conspiracy sentence was "for *planning* the robbery," while stating that the "sentence imposed for the attempt was for the steps appellant took toward *consummating* that plan." *Id.* at 629–30, 547 A.2d 1086. In *Carroll*, there was no direct evidence of an agreement to rob or a factual recitation of what planning, if any, went into the attempted robbery. In denying merger that court stated: "[w]hat differentiates attempt from conspiracy is that attempt requires some overt act be taken in furtherance of the crime," whereas conspiracy serves as a "sanction against group activity." 428 Md. at 699, 53 A.3d 1159 (citations omitted).Thus, the "planning" referred to in both cases appears to equate to forming an agreement with another to commit an unlawful act. Clearly, appellant's actions went to consummating the plan.

a motive to testify falsely[.]" Subsection (a) of Maryland Rule 5–609 ("Impeachment by evidence of conviction of crime") states:

> For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during examination of the witness, but only if (1) the crime was an infamous crime or other crime relevant to the witness's credibility and (2) the court determines that the probative value of admitting this evidence outweighs the danger of unfair prejudice to the witness or the objecting party.

"Under Maryland law, a witness may [also] be impeached by cross-examination to show that the witness previously made inconsistent statements." *Sessoms v. State*, 357 Md. 274, 292, 744 A.2d 9 (2000).

 The right of cross-examination, however, "is not unlimited." *Ebb v. State*, 341 Md. 578, 587, 671 A.2d 974 (1996). According to subsection (a) of Maryland Rule 5–611 ("Mode and order of interrogation and presentation: control by court; scope of cross-examination; leading questions"),

> [t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

"Control over the scope of cross-examination has traditionally been left to the discretion of the trial court unless there is 'a showing of prejudicial abuse of discretion,' " *Commission on Medical Discipline v. Stillman*, 291 Md. 390, 422, 435 A.2d 747 (1981) (quoting *Fleming v. Prince George's County*, 277 Md. 655, 358 A.2d 892 (1976)), that "inhibited the ability of the defendant to receive a fair trial." *Pantazes v. State*, 376 Md. 661, 681–82, 831 A.2d 432 (2003). If we conclude that the examination was "erroneously restricted, we then apply a

harmless error standard of review." *Owens v. State*, 161 Md.App. 91, 111, 867 A.2d 334 (2005).

## Demarics Banks

During cross-examination of Banks the following exchange occurred:

[Appellant's counsel]: In the ... answers to some of the questions during your interview [at the Wicomico County's Sheriff's Office], you did say that you sold a lot of dope, that that was the only thing that you had ever done?

[Banks]: No.

[Prosecutor]: Objection, Your Honor.

The Court: Approach.

(Counsel and [appellant] approached the bench and the following occurred.)

[Prosecutor]: Your Honor, that's not a crime of impeachment.

The Court: Why do you ask that question, sir?

[Appellant's counsel]: Your Honor, [Banks] said it. It's in the interrogation. It's in the statement.

The Court: Pardon me?

[Appellant's counsel]: [Banks] said it. It's in his statement. It reflects on his credibility.

The Court: He said he didn't say it.

[Appellant's counsel]: Okay, well . . . .

The Court: He denied making that statement. And you are correct, Madam Prosecutor, that is not an impeachable offense, *simply in the form it was presented.* Sustained.

(Emphasis added).

██ Appellant asserts: "The trial court erred in ruling that distribution of drugs is not an impeachable offense, and in failing to permit [appellant's counsel] to impeach the witness with his prior inconsistent statement to police in which he admitted that he did sell drugs." The State, viewing the issue as impeachment by "evidence of a collateral prior bad act,"

states that the trial court "properly exercised its discretion to limit" this line of questioning.

Preliminarily, the court did not rule that "distribution of drugs is not an impeachable offense." Rather, it ruled that it is not an impeachable offense "in the form it was presented." Under Rule 5–609, a prior criminal *conviction* for drug distribution may be used to impeach a witness. *See State v. Giddens*, 335 Md. 205, 217, 642 A.2d 870 (1994). We perceive no error or abuse of discretion in sustaining the prosecutor's objection.

Nor, based on our review of the colloquy, are we persuaded that appellant's counsel was attempting to impeach Banks through a prior inconsistent statement. First—and assuming that Banks's denial was in response to appellant's counsel's assertion, "you did say that you sold a lot of dope," rather than to the assertion "that that was the only thing that you had ever done"—it was not until *after* these questions were asked that there was any basis to advance impeachment by an inconsistent statement. We do not see where appellant made it clear to the court that the sale of "a lot of dope" exchange was laying the foundation for impeachment by a prior inconsistent statement or pursued it after the court sustained the prosecutor's objection.

### Sergeant Blades

During direct examination, the following exchange occurred between the prosecutor and Sergeant Blades:

[Prosecutor]: Did [appellant] say anything to you about trying to change his mind?

[Sergeant Blades]: He said that he did change his mind but that he did not relay that to Demarics Banks or Shawn Franklin. He said that he changed his mind prior to the burglary occurring but that he had not relayed that to anyone.

And, during cross-examination of Sergeant Blades, the following exchange occurred:

[Appellant's counsel]: You said that [appellant] said that he changed his mind.

[Sergeant Blades]: That's what he told me, yes.

[Appellant's counsel]: And what do you mean he changed his mind, about what?

[Prosecutor]: Objection.

The Court: Sustained.

[Prosecutor]: [Sergeant Blades] can't say what [appellant] means.

Appellant argues:

The trial court erred in sustaining the objection. The question asked what [Sergeant Blades] meant by the answer, not what appellant meant. The State asked the question on direct examination about appellant changing his mind. [Sergeant Blades] answered the question.

According to appellant, the error was not "harmless" because "withdrawal from a conspiracy constitutes a complete defense to the crime of conspiracy." The State responds that, even if it the court abused its discretion in sustaining the objection, the error was harmless.

 We agree with the State. First, as we have previously explained, mere withdrawal is not a "complete defense" to the crime of conspiracy. *See supra,* n. 19. Second, as pointed out by the State, what appellant "sought to elicit was admitted through another source (besides Sergeant Blades's direct examination)." More specifically, Sergeant Hall, who was part of the conversation with appellant described by Sergeant Blades, testified, without objection, that appellant had told the sergeants that "[h]e wasn't involved in the burglary. He said that he had backed out at the last minute before they went and actually committed the burglary." A "ruling, even if erroneous, would not present a reversible error" where "it is clear that the identical fact, sought to be proved by one witness, was subsequently proved without objection by another witness." *Gouker v. State,* 224 Md. 524, 530, 168 A.2d 521 (1961).

*Death of Barbara Greene*

Referencing the following conversation, appellant states that, "[p]rior to trial, in the trial court's chambers appellant moved *in limine* to exclude evidence that the occupant of the Greene home was killed": [28]

[Appellant's Counsel]: Your Honor, may we approach on— should we address the question the Court asked [appellant], as in reference to *the opening remarks, the Court's opening remarks,* a description of the offenses to the jury?

[Appellant's Counsel]: All right. The discussion with [appellant], and he would prefer no reference to the death of [Barbara Greene] in *the Court's opening remarks to the jury.*

[The Court]: Okay. To put it in some level of context, we discussed this matter with Counsel in Chambers. Our understanding of the charges [is] that they basically allege that [appellant] conspired to . . . plan and commit the crime of burglary. That crime allegedly occurred and an individual died in the course of or as a result of that crime. [Appellant] is not charged with the death or any of the aspects of the death of that individual. Is that correct?

[Prosecutor]: That is correct, Your Honor, yes.

[The Court]: The question we raised was . . . whether the parties wanted the Court to describe the facts of this case to include that [appellant] is charged with the crime of conspiring to commit the crime of breaking and entering or burglary. Subsequent to the burglary or in the course of the burglary somebody died. Or do you wish us to simply allege that [appellant] is charged with the crime of conspiracy to commit the crime of burglary? One of the witnesses who may testify in this matter, from our understanding of

---

**28.** Although a copy of it is not included in the record, the trial transcript indicates that appellant had filed a motion *in limine* on matters other than the death of Ms. Greene. Before trial, the court discussed and ruled on the points made in the motion, and then, when it asked if there were "any other preliminary motions," appellant's counsel raised the issue of the death of Ms. Greene.

the case, is an individual who has pled guilty to causing the death of the individual and that person is going to testify to implicate [appellant], and the conspiracy aspect of this case, and the conspiracy aspect of the case only. The State did not intend to bring out the death of the victim but the defense may inquire of this witness regarding that person's plea and the plea arrangement made for that person's testimony. *So the question was whether we refer to the death in the opening statements by—the preliminary statements by the Court to the jury and now the answer we have is, no.*

[Appellant's Counsel]: That's correct, Your Honor.

[The Court]: Is that the record as we understand it, [Ms. prosecutor]?

[Prosecutor]: Yes, Your Honor, however I would ask that you mention that the home belonged to Barbara Greene and Reginald Greene. Just so that it might jog in somebody's memory whether or not they heard about it.

[The Court]: All right.

[Appellant's Counsel]: That would be acceptable.

(Emphasis added).

Appellant asserts that "the trial court erred in admitting evidence that the occupant of the burglarized home was killed where the State agreed that the evidence would not be admitted." Appellant points to the following incidents during trial:

- during opening statements, the prosecutor stated that appellant had told Sergeant Blades and Sergeant Hall that "there was not supposed to be anybody home" during the burglary;

- during direct examination of Reginald Greene, the prosecutor asked, "[h]ow old *was* your sister?" (emphasis added);

- during direct examination of Reginald Greene, the following exchange occurred:

 [Prosecutor]: And what else did you notice [when you returned to the home]?

[Greene]: A little blood.

[Appellant's counsel]: Objection.

The Court: Approach please, One moment, sir.

(Counsel and [appellant] approached the bench and the following occurred.)

[Appellant's counsel]: Your Honor, we're getting into the stuff of remote relevance, and it's very prejudicial.

[Prosecutor]: That wasn't the intent. I didn't know he was going to say he saw the blood.

The Court: Can you lead him—

[Prosecutor]: Yes.

The Court:—around the area? I give you permission to do so.

[Prosecutor]: That's fine.

[Appellant's counsel]: Thank you.

(Counsel and [appellant] returned to trial tables and the following occurred in open court.)

\*　　\*　　\*

[Prosecutor]: Once you noticed, once you made these observations [that there was snow and footprints inside the Greene home], did you leave the house?

[Greene]: No, I was calling, I was calling for my sister, I kept calling her name out, and she didn't answer;

- and, during direct examination of Detective Taylor, the following exchange occurred:

[Prosecutor]: All right. Throughout the time of your interview of [appellant], did he ever indicate that he had any knowledge of the events that occurred at [the Greene home] on December 17?

[Detective Taylor]: No, he made statements that he did not know the people involved and didn't care who was killed.

[Prosecutor]: Now, when he said he didn't, you said, he said, he didn't care who was killed?

[Detective Taylor]: Correct.... He was indicating that he didn't know who the people that we were mentioning their names to him, who we were talking about, he said he didn't know them and he didn't know the person that was killed and he had no involvement whatsoever.

Even if exclusion of reference to the death of Barbara Greene was part of appellant's motion *in limine*, the court's ruling expressly confined references to her death to the court's preliminary statements ("So the question was whether we refer to the death in ... the preliminary statements by the Court to the jury and now the answer we have is, no."), and that was accepted by appellant's counsel ("That's correct, Your Honor."). Here, appellant has not referred us to any preliminary statements made by the court regarding the death of Barbara Greene. Furthermore:

- no objection was made to the statement "there was not supposed to be anybody home," and the question "[h]ow old was your sister," which refer obliquely to the death of Barbara Greene;

- when appellant's counsel objected to Reginald Greene's reference to blood, the court permitted the prosecutor to lead the witness and there was no request for further relief; and

- no objection was made to Detective Taylor's remarks that referred directly to the death of someone at the Greene home.

In sum, we are not persuaded that the court erred or abused its discretion.

**JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY AFFIRMED IN PART AND REMANDED IN PART FOR FURTHER PROCEEDINGS TO VACATE ONE OF THE CONSPIRACY SENTENCES AND CONVICTIONS. COSTS TO BE SPLIT BETWEEN APPELLANT AND WICOMICO COUNTY.**